BRIAN L. DAVIDOFF (SBN 102654)
BDavidoff@ggfirm.com
JONATHAN S. SHENSON (SBN 184250)
JShenson@ggfirm.com
JONATHAN J. BOUSTANI (SBN 274748)
JBoustani@ggfirm.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California  90067
Telephone:    310-553-3610
Facsimile:    310-553-0687

Attorneys for Debtor Rosland Capital LLC

**GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**
**2049 Century Park East, Suite 2600**
**Los Angeles, California  90067**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Rosland Capital LLC,<br><br>        Debtor. | Case No. 2:26-bk-16650-BB<br><br>Chapter 11<br><br>**DECLARATION OF MICHAEL HOGAN IN SUPPORT OF FIRST DAY MOTIONS**<br><br>Date:      July 7, 2026<br>Time:     2:00 p.m.<br>Place:    Courtroom 1539<br>          255 E. Temple Street<br>          Los Angeles CA 90012<br>**(or via ZoomGov per posted procedures)** |

DECLARATION OF
MICHAEL HOGAN

**DECLARATION OF MICHAEL HOGAN**

I, Michael Hogan, hereby declare as follows:

1.    I am a Partner of Armanino Advisory LLC ("Armanino"). Rosland Capital LLC ("Debtor") retained Armanino to provide strategic assessment and financial advice in connection with the liquidation of the Debtor's business. Pursuant to the Debtor's engagement of Armanino, I am to serve as the Chief Restructuring Officer ("CRO") of the Debtor with broad authority to develop and execute a plan to liquidate the Debtor's assets.

2.    I submit this declaration in support of the following (the "First Day Motions"):

   a.   Motion to Redact Customer Names and Related Relief;

   b.   Application to Retain and Employ BMC Group, Inc as Noticing Agent.

3.    Unless otherwise stated, the facts set forth herein are based upon my personal knowledge, my review of the Debtor's books and records, information provided to me by the Debtor's officers, employees, professionals and advisors, or my experience serving as a restructuring professional. If called as a witness, I could and would competently testify thereto.

**I.    BACKGROUND AND QUALIFICATIONS**

4.    On or about June 18, 2026, the Debtor retained Armanino to provide strategic advisory, restructuring, liquidation, cash management, sale process, and chief restructuring officer services. Pursuant to Armanino's engagement letter, I am to serve as CRO of Debtor with broad powers to develop and execute a plan to liquidate Debtor's assets. A true and correct copy of the engagement letter dated June 18, 2026 is attached hereto as **Exhibit 1.**

5.    Similarly, pursuant to the Written Consent of the Sole Member and Sole Director of Rosland Capital, LLC dated July 1, 2026 ("Consent"), I was appointed as CRO of the Debtor and authorized to oversee the Debtor's liquidation efforts, evaluate strategic alternatives, supervise liquidity management, coordinate with professionals, and assist with a chapter 11 bankruptcy filing and liquidation process. Attached hereto as **Exhibit 2** is a true and correct copy of the Consent.

6.    Armanino is one of the largest assurance, tax, audit, and consulting firms in the United States. It is the largest independent firm headquartered in California with a total of thirty

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

offices in the United States, Canada and India, including eight offices in California and offices in New York, Chicago, Dallas, Atlanta, St. Louis, Seattle, Boise, Denver, and Vancouver. Armanino has deep expertise in corporate restructurings, operations improvement, corporate finance, valuations, and bankruptcy advisory services. Armanino has extensive experience in the asset management industry as well as specific professionals trained in restructuring, forensics, and financial operations.

7.    Armanino is among California's most experienced restructuring specialists, serving the needs of the many constituents of insolvent companies that may be confronting and contemplating formal bankruptcy.

8.    Armanino is often retained as the CRO, serving as the restructuring expert for the board, creditors, management, and shareholders.

9.    I lead the national Corporate Finance and Restructuring Practice at Armanino. I am a restructuring professional with more than 35 years of experience advising distressed businesses, debtors, creditors, lenders, boards of directors, receivers, and fiduciaries in insolvency matters, restructurings, liquidations, and chapter 11 proceedings.

10.    Since our retention, the members of my team and I have worked extensively with the Debtor's management, legal counsel, and financial personnel to identify business assets, assist in the wind down of the Debtor's operations and gather the necessary information to commence a chapter 11 case.

## II.    DEBTOR'S BUSINESS

11.    The Debtor is a Delaware limited liability company that was formed on or about June 19, 2008. The Debtor was headquartered in Los Angeles, California with an additional office located in Henderson, Nevada. Marin Aleksov founded the Debtor and serves as Chief Executive Officer and managing member of the company (now subject to the restrictions set forth in the Consent). Marin owns 100% of the Debtor.

12.    The Debtor marketed and sold gold, silver, platinum, and other precious metals to retail consumers throughout the United States. The Debtor offered the following products:

    a. *Exclusive Specialty Coins*: a selection of specialty, premium, proof coins that were

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

75837-00002/8109526.1

3

DECLARATION OF
MICHAEL HOGAN

licensed from brands such as Formula 1, PGA TOUR, Davis Cup, Billie Jean King Cup, Fernando Hierro, and the British Museum (as discussed below the licensing was through Rosland Hong Kong);

   b. *Exclusive Coins*: precious metal proof and reverse proof coins portraying Lady Liberty in gold and silver;

   c. *Numismatic coins*: generally older gold and silver coins including coin specimens graded by recognized professional entities such as the Professional Coin Grading Service;

   d. *Bullion Coins*: a wide range of silver and gold bullion coins including the Canadian Maple Leaf, South African Krugerrand, American Gold Buffalo, and American Gold and Silver Eagle in proof and non-proof formats;

   e. *Bullion/Bars*: gold, silver, and palladium bars from name-brand mints that meet specific levels of quality and size.

13.    To my understanding from approximately 2013 until May 2026, Rosland Hong Kong was the vendor that sourced and procured the Debtor's products in addition to selling products to the Debtor's European affiliates and third parties. Rosland Hong Kong also held the exclusive global licenses for the brands that issued the Debtor's Exclusive Specialty Coins.

14.    Rosland Hong Kong began operations in 2013 and is headquartered in Hong Kong. Marin Aleksov owns 50% of Rosland Hong Kong and SCAN Invest, Ltd., a Hong Kong investment company, owns the remaining 50% of the company. Julian Aleksov, the brother of Marin Aleksov, is the director and CEO of Rosland Hong Kong.

15.    The Debtor purchased its coins and other products from Rosland Hong Kong. Rosland Hong Kong had contracts with third party mints, including the Switzerland-based MKS PAMP ("PAMP"), that designed and manufactured gold and silver coins. When the Debtor sold a product to a customer and received payment from the customer, the Debtor would place an order for the product with PAMP's sister company in the United States, Manfra Tordella and Brookes ("MTB"), or Numismatics Unlimited Inc. ("NUI"), as precious metals dealer based in the United States. MTB or NUI would invoice Rosland Hong Kong for the products, release the products

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

75837-00002/8109526.1

4

DECLARATION OF
MICHAEL HOGAN

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

upon receipt of payment from Rosland Hong Kong, and then drop ship the product to the customer, ship the product to the Debtor in the United States, or transfer products held at Delaware Depository Services Company ("DDSC") to Debtor for transfer to the customer's account at DDSC.

16.    The Debtor also sold precious metals for inclusion in metal-backed individual retirement accounts (IRAs). The Debtor's customers would open self-directed IRAs with transfer agents Equity Trust Company ("Equity") and GoldStar Trust ("GoldStar"). Customers would remit funds to Equity or GoldStar for purchase of the Debtor's product. Equity and GoldStar would forward those funds to the Debtor, which would purchase the products. Those products would be deposited in the customer's separate and individualized account at DDSC.

17.    The Debtor advertised and marketed its products on, or through, Fox News, Newsmax, Google, Bing, AI, Debtor's website, and other channels. The Debtor also retained actor William Devane as a spokesman for the Debtor's products starting in 2012. Customers generally learned of the Debtor's products through these channels, contacted the Debtor, communicated with the Debtor's sales representatives, and then purchased the Debtor's products through those representatives. Periodically, the Debtor also directed marketing calls to customers who had previously contacted the Debtor. Accordingly, the Debtor's business model relied heavily upon direct marketing, customer relationships, and proprietary customer databases developed over many years.

### III.    DEBTOR'S HISTORICAL FINANCIAL PERFORMANCE

18.    Based upon my initial review of the Debtor's financial statements provided to me, the records indicate the Debtor historically generated significant annual revenue through the sale of precious metals products, including bullion, numismatic coins and  specialty coins. The Debtor reported revenue of approximately $151.2 million in 2021, $109.5 million in 2022, $113.2 million in 2023, $107.1 million in 2024, and $97.8 million in 2025. For the period preceding the Petition Date in 2026, the Debtor reported revenue of approximately $28.0 million. Although revenue remained substantial during this period, the Debtor experienced a significant deterioration in profitability.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

19. The Debtor's gross profit declined from approximately $27.9 million in 2021 to approximately $18.2 million in 2022, $19.7 million in 2023, $14.5 million in 2024, and $8.5 million in 2025. Gross profit margins likewise declined from approximately 18.4% in 2021 to approximately 8.7% in 2025. During the same period, the Debtor continued to incur substantial operating expenses, including significant advertising and marketing costs, valuation gap related to trade order timing, sales commissions, payroll, occupancy costs, and professional fees. As gross margins compressed, the Debtor's operating expenses increasingly exceeded its gross profit, placing substantial pressure on liquidity.

20. The Debtor's financial performance deteriorated materially after 2021. The Debtor generated net income of approximately $10.2 million in 2021 but thereafter reported losses of approximately $0.2 million in 2022, $3.7 million in 2023, $6.5 million in 2024, and $13.7 million in 2025. For the period preceding the Petition Date in 2026, the Debtor reported an additional net loss of approximately $3.2 million. In total, the Debtor incurred cumulative net losses exceeding $24 million from 2022 through 2025. These sustained losses, combined with increasing customer obligations and working capital demands, significantly impaired the Debtor's liquidity and contributed to the circumstances that ultimately necessitated the commencement of these chapter 11 cases.

**IV.    EVENTS LEADING TO CHAPTER 11**

21. Prior to my engagement, the Debtor began to experience financial distress. Due to excessive cash outflows and other challenges, the Debtor became unable to satisfy customer demands relating to precious metals purchases that customers contend were paid for but records indicate were not delivered.

22. The Debtor's financial distress was exacerbated by the increase in price of gold and other precious metals. The price of gold fluctuated between $1,500 per ounce and $2,000 per ounce from approximately 2020 through 2023. By the end of 2024, the price of gold had risen significantly to approximately $2,600 per ounce. In 2025, however, there was a historic surge in the price of gold, which rose as high as $4,500 per ounce and ended the year at approximately

75837-00002/8109526.1

6

DECLARATION OF
MICHAEL HOGAN

$4,300 per ounce. In 2026, the price of gold continued to surge, reaching a peak of approximately $5,600 per ounce.

23.     As a result of this historic surge in the price of gold, customer orders of the Debtor's products also surged. Debtor was unable to keep up with the increased volume of customer orders and developed a backlog of orders. Due to the backlog, there was often a months-long gap in time between the date when a customer placed an order with the Debtor and paid for a gold product, and the date when the Debtor purchased the product from third parties to provide to the customer. During this interval, the price of gold usually increased dramatically such that Debtor ended up paying more for the gold product than the customer paid Debtor for that product. This situation was not sustainable and the Debtor lost money rapidly.

24.     Another financial impediment to the Debtor's business was the structure of the commissions that the Debtor paid its sales representatives. Upon receipt of payment from the customer, the Debtor's sales representatives were paid a commission ranging from 15%- 35% of the gross profit on the corresponding sale. Under the Debtor's arrangement with its sales representatives, the sales commission were earned upon receipt of funds from the customer even if the customers later cancelled their orders or the Debtor was unable to fulfill the orders.

25.     From an accounting perspective, the Debtor only recorded revenue when the Debtor shipped the product the customer had ordered. Funds that the Debtor received from a customer for a product that had not been shipped were recorded as "Deferred Revenue". Due to the growing backlog that was created by the Debtor's inability to timely deliver products to customers, the Deferred Revenue account also continued to grow.  As of the petition date, Debtor's Deferred Revenue is approximately $49 million

26.     The Debtor also had a policy of buying back precious metals from customers, or from any party who wished to sell their precious metal product to the Debtor. As with the Deferred Revenue, the Debtor eventually found itself unable to timely pay the customers who had delivered their product to the Debtor for repurchase. This was recorded as a "Buy Back List". As of the petition date, the Buy Back List is approximately $11.8 million.

75837-00002/8109526.1

7

DECLARATION OF
MICHAEL HOGAN

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

27.     As the Debtor's liquidity deteriorated, increasing numbers of customers submitted complaints, demands, and threats of litigation. As of June 22, the Debtor had its compliance department automatically forward emails and voice messages to proposed counsel for the Debtor. I reviewed a compilation of these emails and vice messages sent to me by counsel.  As of June 27 there were approximately 470 voicemails, emails or demands made through the compliance department for return of funds allegedly paid for the Debtor's products, delivery of the products for which they allegedly paid, or other claims. To date, however, my understanding is that only one customer has filed a lawsuit against Debtor to recover the money they purportedly paid the Debtor for the Debtor's products. Nevertheless, customers continue to assert claims against Debtor.

28.     Additionally, the office of New York Attorney General has begun an investigation of the Debtor's product sales to New York customers through 2023. However, my understanding is that the Debtor has not sold products to customers in New York for some time, and I have been told that the investigation has been relatively inactive.

29.     The United States Securities and Exchange Commission (SEC) is also investigating the Debtor in connection with its products for metal-backed IRAs. The SEC is currently scheduling interviews of the Debtor's personnel.

30.     Based upon my review of the Debtor's financial condition, the Debtor lacks sufficient liquidity to satisfy all customer demands and other creditor claims as they become due.

**V.     WIND DOWN OF THE DEBTOR'S OPERATIONS**

31.     Prior to my appointment as CRO, I worked with the Debtor's management, professionals, and advisors to evaluate available alternatives, including: (a) continuing operations; (b) pursuing an out-of-court wind down; (c) assigning assets for the benefit of creditors; (d) commencing a chapter 7 liquidation; and (e) pursuing a liquidating chapter 11 case.

32.     After evaluating each alternative, I concluded that a liquidating chapter 11 proceeding provides the best opportunity to maximize value for creditors, provide transparency for creditors/customers and administer claims in an orderly and efficient manner.

Docusign Envelope ID: E3FF5B38-875D-8DB6-8145-2179B6E3F51A

33.    By the time of my engagement, management of the Debtor had already concluded that the mounting customer claims and liquidity constraints created a situation in which the Debtor could no longer continue operating in the ordinary course.

34.    Working with counsel for the Debtor, we assisted the Debtor with a wind down of its operations, including the following:

a.    Termination of all of the Debtor's employees as of June 19, 2026, except for one employee in the accounting department and one employee in the information technology (IT) department necessary who have agreed to assist on a consulting basis;

b.    Collecting the Debtor's financial records;

c.    Reviewing, analyzing, and collating the information necessary to prepare the Debtor's chapter 11 bankruptcy petition.

35.    Based upon my ongoing investigation to date, the Debtor's principal remaining asset consists of its past, active and potential customer lists, customer relationship information, customer data, marketing records and related intangible assets developed over many years of operation (collectively, the "Customer Information Assets"). Based on my review of the Debtor's financial records and my conversations with the Debtor's personnel, the Debtor no longer possesses any inventory of precious metals, coins, or bullion, and has limited funds in its financial accounts.

36.    In my business judgment, the Customer Information Assets are significantly more likely to realize value through a structured, court-supervised marketing and sale process than through an immediate chapter 7 liquidation.

37.    In my business judgment, absent bankruptcy protection, the Debtor would face a chaotic and value-destructive race among creditors that would substantially impair recoveries for all stakeholders.

## VI.    BENEFITS OF A LIQUIDATING CHAPTER 11

38.    Since our engagement, we have devoted substantial time to understanding the Debtor's operations, books and records, financial affairs, customer obligations, litigation

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

exposure, and remaining assets. Together with the Debtor's professionals, I have conducted extensive diligence regarding the Debtor's affairs and have developed familiarity with the Debtor's records, personnel, and stakeholders.

39.     Because the Debtor's primary remaining asset consists of intangible customer information rather than readily liquidated hard assets, preservation of institutional knowledge is particularly important. The value of those assets depends in substantial part upon understanding the Debtor's historical business practices, customer data systems, and marketing materials. My team and I have worked hard to understand these issues.

40.     Chapter 11 provides a flexible and efficient framework to market and sell assets pursuant to court-approved bidding procedures. Such procedures are designed to maximize value through competition and transparency while providing certainty to prospective purchasers.

41.     It is the intention of the Debtor to promptly file a plan which provides for a liquidating trust which will manage all remaining assets of the Detor, including the proceeds from any sale of the Debtor's assets, and also manage any litigation recoveries. It is expected that once a unsecured creditors committee is formed, the committee will have significant input into the structure of the liquidating trust.

42.     A chapter 11 process also permits the Court to maintain direct oversight over the administration of the estate, the sale process, and distributions to creditors while allowing the estate to utilize professionals who already possess detailed knowledge of the Debtor's affairs.

43.     Maintaining the chapter 11 structure will facilitate efficient communications with creditors, customers, regulators, and other parties in interest because the existing management representatives, CRO, and professionals have already established working relationships with those constituencies and deep knowledge of the business.

44.     I believe that a  liquidating plan confirmed with stakeholder input will provide the greatest transparency and engagement for stakeholders. It is also my belief that this structure will in the long run be far more cost effective than creditors filing separate lawsuits or bringing independent actions for recovery.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

75837-00002/8109526.1

10

DECLARATION OF
MICHAEL HOGAN

**VII.    MARKETING AND SALE PROCESS**

45.    The Debtor intends to promptly file a *Motion To Approve Sale Procedures For The Auction Of Customer Information Assets* whereby the Debtor will sell its Customer Information Assets through a structured and competitive sale process designed to maximize value for the estate. There are approximately 35,000 customers and over 65,000 potential customers (people that have responded to advertising that have not purchased products) identified in the Debtor's records, of which approximately 484 are on the Deferred Revenue List, and approximately 133 are on the  Buy Back List.

46.    Potential purchasers may include participants in the precious metals industry, direct marketing companies, customer acquisition platforms, financial services businesses, lead generation companies, and other strategic purchasers that may derive value from the Customer Information Assets.

47.    The Debtor intends that the proposed bidding procedures will establish a transparent process intended to encourage competitive bidding and maximize recoveries for creditors. The Debtor also expects that the creditors' committee, assuming one is formed, will have significant input into the sale process.

**VIII.    REDACTION OF CUSTOMER INFORMATION AND RELATED RELIEF.**

48.    Based on my review of the Debtor's books and records and my investigation to date, the Customer Information Assets are the principal remaining assets of the Debtor. The value of the Customer Information Assets derives almost entirely from the fact that the customer identities and associated customer information are not publicly known. The Debtor intends to file a motion seeking Court approval of a sale and auction of the Customer Information Assets. Public dissemination of the identities and contact information of the Debtor's customers would undermine the Debtors' ability to conduct a sale of the Customer Information Assets that maximizes value to the estate because, among other things, it would allow the Debtor's competitors to use the information to poach the Debtor's customers. Accordingly, the Debtor seeks an order authorizing redaction of the names of the Debtor's customers, and all associated

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

75837-00002/8109526.1

11

DECLARATION OF
MICHAEL HOGAN

information identifying the customers, from any documents filed publicly in this action, including without limitation the creditors matrix, schedules, and statements.

49.    I am also concerned that if the Debtor were to publish the names and contact information for its customers, competitors and other unscrupulous parties may use this to their advantage to harass the Debtor's customers with unwanted solicitations for goods or services. Publication of customers names would thus create a risk to customers' privacy and security as it would identify people (without their consent), their addresses, and their inclination to invest in commodities online, thereby potentially rendering them susceptible to illegitimate offers from unscrupulous individuals.

50.    Redaction and sealing will not prejudice any creditor's right to notice. The Debtor will instruct its Noticing Agent, subject to any order limiting notice, to serve each customer-creditor at their personal addresses or e-mail addresses, as applicable, ensuring that all creditors receive the same notices in this case as in any other chapter 11 case. Additionally, unredacted versions of all relevant filings will be made available to the Court, the Office of the United States Trustee for the Central District of California, and counsel to any official committee appointed in these cases, and to any other party upon Court order.

51.    I understand that typically the Bankruptcy Court serves the notice of commencement of the bankruptcy case (the "Case Commencement Notice"). I respectfully submit that there is a good reason for having the Debtor's Noticing Agent serve the Case Commencement Notice and the bar date notice upon all of the Debtor's creditors. The Debtor is in a highly competitive industry and the Debtor's list of customers is a significant asset of the business. There are approximately 617 customers of the Debtor who are also on the creditor matrix. The creditor matrix is approximately 650 parties.  If the Bankruptcy Court were to serve the Case Commencement Notice upon the entire list of parties to be served, which includes the Debtor's customers, I expect that it would file a certificate of service that would identify all the parties served.  That list would then become public. Accordingly, for the reason set forth above publication of the identity of any the Debtor's customers would cause the Debtor to suffer immediate and irreparable harm.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

DECLARATION OF
MICHAEL HOGAN

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

### IX.    NEED FOR IMMEDIATE RELIEF

52.    The Debtor has served the First Day Motions only on the United States Trustee and the 20 largest creditors

53.    While the Debtor has substantially completed all of the schedules for the filing of the bankruptcy petition, the Debtor has as of this time filed only the Voluntary Petition (Official Form 201), List of Creditors Holding the 20 Largest Unsecured Claims (Official Form 204), , and the Master Mailing List of Creditors.

54.    **However the List of 20 Largest Creditors and the Master Mailing List of Creditors contains only the names of non-customer creditors for the reasons stated above.** If the Court approves the above requested relief then the Debtor will submit under seal the complete mailing matrix and creditor list, and other schedules which contain the names of the customers. This information will also be provided to, and held in confidence by the United States Trustee, counsel for any committee that may be appointed, and delivered to the Debtor's Noticing Agent. The Noticing Agent will then send such notices to all of the creditors and parties in interest, as directed by the Court.

55.    Immediate approval of the First Day Motions is necessary to preserve estate value and facilitate an orderly liquidation process.

56.    The relief requested will enable the Debtor to preserve assets, administer claims in an organized manner, and pursue a value-maximizing sale process.

57.    Absent such relief, the Debtor and its stakeholders may suffer immediate and irreparable harm.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed at San Francisco California this 2nd day of July 2026.

Signed by:

*Michael Hogan*

MICHAEL HOGAN

75837-00002/8109526.1

13

DECLARATION OF
MICHAEL HOGAN

# EXHIBIT 1

*Primary Contact:*
Michael Hogan
Partner
1(408)240-4908
michael.hogan@armanino.com

Rosland Capital LLC



Docusign Envelope ID: 3884D290-0F17-8637-803A-C805DCCB8CF6

Rosland Capital LLC

June 18, 2026

Armanino Advisory LLC
2700 Camino Ramon, Suite 350
San Ramon, CA 94583-4600
925 790 2600
armanino.com

June 18, 2026

Marin Aleksov
CEO
Rosland Capital LLC
11766 Wilshire Blvd
Los Angeles, CA 90025

Dear Marin:

Armanino Advisory LLC ("Armanino," "Consultant," "we" or "us") is pleased to provide the services described below (the "Services") to Rosland Capital LLC ("Client" or "you").

The Services are subject to the terms and conditions of this engagement letter and the Terms & Conditions for Professional Services, located at https://www.armanino.com/armanino-advisory-llc-terms-professional-services/ (together, this "Agreement").

## Services

This engagement will generally include business operations management services. Armanino will provide consulting resources to Client, of the type and level described in this Agreement, on an as-needed basis through December 31, 2026. The Services are more specifically set forth in Exhibit A hereto.

Our services under this Agreement will not constitute an engagement to provide audit, compilation, review, or other attestation services as described in the pronouncements on professional standards issued by the AICPA and, therefore, we will not express an opinion or other form of assurance with respect to our services or the business's internal control systems or its compliance with laws, regulations, or other matters.

## Project Fees and Expenses

### *Fees*

As compensation for the Services, Client shall pay Armanino the sum(s) as shown in Exhibit A hereto. If Armanino uses an automobile on Client's behalf, Client shall reimburse Armanino for actual miles traveled at the then-current IRS mileage reimbursement rate.

### *Invoicing*

Armanino will invoice Client as of the fifteenth and last day of each month for services performed pursuant to this Agreement. Subject to any applicable bankruptcy rules, Client shall pay all invoices, in full, within five (5) business days of the invoice date, except for the Sale Advisory fees (as described in Exhibit A), which shall be due as indicated.

Declaration Exhibit 1 Page 0016

© Armanino | armanino.com

2

CONFIDENTIAL PDOC

*__Fee Deposit__*

Armanino requires that Clients pay a fee deposit (the "Fee Deposit") of two hundred thousand dollars ($200,000) upon execution of this Agreement, which, subject to any applicable bankruptcy rules, the Company will replenish on a twice monthly basis to maintain a Fee Deposit amount of at least two hundred thousand dollars $200,000), before we will perform any further services. You hereby grant us a security interest in any and all Fee Deposits made pursuant to this engagement letter to secure payment to us of any future Fees and Charges. The Fee Deposit will be applied to our invoices twice each month, with any excess balance being invoiced to the Clients, and the Clients will, subject to any applicable bankruptcy rules, pay any such excess balance monthly, and Armanino reserves the right from time to time in the future to request that the amount of the Fee Deposit be increased. The Fee Deposit will be held, without interest, until the end of Services, and will be applied against the remaining outstanding invoices.

Prior to initiating any insolvency process or filing for bankruptcy, we will require that Client increase the Fee Deposit to two hundred thousand dollars ($200,000). The Fee Deposit will be held, without interest and can be drawn based on post filing invoices submitted, properly noticed, and receiving no objection, if Client does not pay timely. Any Fee Deposit remaining at the end of this engagement will first be applied against the final invoice pursuant to this Agreement, and if any Fee Deposit remains, shall be refunded to Client.

You will also be invoiced for actual out-of-pocket expenses including, but not necessarily limited to, non-local travel and lodging expenses, meals, communications charges and supplies and all taxes, as applicable. Travel time is billed at 50% of the normal rate. Processing time for Armanino to process timesheets and invoices in Client's specific software solutions will be charged at time and material rates.

## Additional Terms

Except to the extent of the CRO Services, Armanino does not have, and is not granted by this Agreement, any express or implied right or authority to assume or create any obligations on behalf of, or in the name of, Client; or to bind Client to, or enter into, directly or indirectly, any contract, agreement or undertaking with any third party.

You may terminate the Services at any time by giving us 30 days written notice. If you terminate the Services, you will pay for the Services performed and expenses incurred through the effective date of termination.

Any obligation of confidentiality owed by Armanino to Client, including any confidentiality provision of the Terms, shall remain in effect for a period of 24 months following initial disclosure.

In connection with the CRO Services, Client agrees to offer exactly the same level of indemnification to Armanino as Client would normally provide to its officers and directors, including such resolutions by its Board of Directors as are customary regarding officer and director indemnification. Client shall maintain, at its sole cost and expense, sufficient directors & officers' liability (D&O) insurance coverage to cover Armanino and its designated representatives for the Services provided to Client under this Agreement. Client shall take all actions necessary to ensure that Armanino's representatives are insured persons under Client's D&O policy for the Services. Client's D&O policy shall be primary and noncontributory to any Armanino insurance policy. Client will furnish Armanino certificates of insurance and such other documentation relating to such policies as Armanino reasonably requests.

To the maximum extent permissible by law, Armanino will incur no liability of any kind with respect to any action or inaction taken or failed to be taken, by Armanino or by its agents, in connection with its services as under this Agreement, except its own willful misconduct or gross negligence. The Consultant may act in reliance upon any signature reasonably believed by it to be genuine and may reasonably assume that such person had proper authorization to sign on behalf of

Declaration Exhibit 1 Page 0017

the Client. In all questions arising under this Agreement, Armanino may rely on the reasonable advice of counsel, accountants or other skilled persons, and we will not be liable to the Client or the Stockholders, or any other person or party for anything done, omitted or suffered in good faith by Armanino based on such advice of counsel, accountants or other skilled persons, as the case may be. Anything in this Agreement to the contrary notwithstanding, in no event shall Armanino be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), regardless of whether or not any such damages were foreseeable or contemplated and even if Armanino has been advised of the likelihood of such loss or damage, no matter the form of action.

Armanino will not be required to advance its own funds for any reason and may be reimbursed from any available expense funds; provided, that the Client shall promptly pay the Indemnitees for any indemnifiable Losses upon request as each such Loss is incurred.

## Notices

All notices under the Agreement shall be in writing, and shall be deemed given upon personal delivery or upon placing in the United States postal service First Class delivery system, to the addresses set forth below:

**If to Consultant:**
Michael Hogan
Partner
Armanino
2700 Camino Ramon, Suite 350
San Ramon, CA 94583

**If to Client:**
Marin Aleksov
CEO
Rosland Capital LLC
11766 Wilshire Blvd
Los Angeles, CA 90025

Either party may change its notice address by written notice to the other in accordance herewith.

\* \* \*

Declaration Exhibit 1 Page 0018

## Contract Expiration

This engagement letter will expire if not executed within 30 days after issuance date.

## Contract Signatures

THIS CONTRACT, INCLUDING ALL APPENDICES AND THE TERMS & CONDITIONS FOR PROFESSIONAL SERVICES, AT **HTTPS://WWW.ARMANINO.COM/ARMANINO-ADVISORY-LLC-TERMS-PROFESSIONAL-SERVICES/**, IS HEREBY APPROVED AND ACCEPTED:

**Rosland Capital LLC**
11766 Wilshire Blvd
Suite 1200
Los Angeles, CA 90025

**Armanino Advisory LLC**
2700 Camino Ramon
Suite 350
San Ramon, CA 94583

By: *Marin Aleksov*
DocuSigned by:
A5123A81760C48F...

By: *Michael Hogan*

Name: Marin Aleksov

Name: Michael Hogan

Title: CEO

Title: Partner

Signature Date: 6/19/2026 | 9:23 AM PDT

Signature Date: June 22, 2026

### *APS Disclosure; Sharing Information*

"Armanino" is the brand name under which Armanino LLP and Armanino Advisory LLC, independently owned entities, provide professional services in an alternative practice structure in accordance with law, regulations, and professional standards. Armanino LLP is a licensed independent CPA firm that provides attest services, and Armanino Advisory LLC and its subsidiary entities provide tax, advisory, and business consulting services. Armanino Advisory LLC and its subsidiary entities are not licensed CPA firms.

Declaration Exhibit 1 Page 0019

Rasland Capital LLC
June 18, 2026

---

# EXHIBIT A

## SERVICES

The Services shall include the following:

### *Phase 1 - Strategic Advisory*

- Strategic Assessment Regarding Liquidation: advising the Client on strategic plan on liquidating the business. Such work would include review of the current situation, including:
    - Financial Review: review and assessment of assets and liabilities, financial processes and cash flow projections and review of a schedule of all obligations (a waterfall) with the Client's finance team to confirm details and identification of issues related to same.

- Financial Advisory: in connection with liquidation:
    - Financial Information: obtain financial information in connection with liquidation.
    - Communications: develop a plan and program to communicate the status with creditors and stakeholders and plan for all related communications/messaging to provide transparency of the process to such parties.
    - Monitoring: assist the Company in monitoring/measuring its 13 Week cash flow model and budgets to actual, and reporting to appropriate parties, including stakeholders and potentially the Bankruptcy Court.
    - Filings and Schedules: support Client and Client's counsel in the preparation of motions, orders, schedules, Statements of Affairs and Monthly Operating Reports; and testimony: appearing before the Bankruptcy Court on matters that are within our areas of expertise.

### *Phase 2 - CRO*

- CRO: Partner (Michael Hogan) to serve as the Chief Restructuring Officer (the "CRO"); in the execution of the duties set forth below:
    - CRO shall serve as the senior officer of the Company, with broad powers to develop and execute a plan to liquidate the assets of the Company.
    - CRO shall have the authority to negotiate with the Company's creditors and other stakeholders to implement the Liquidating Plan, as determined in the steps outlined below.
    - CRO shall assume decision-making authority, coordinate external advisors, provide oversight and control of operations, and implement enhanced governance controls incidental to the Liquidating Plan.
    - The CRO shall be authorized to lead negotiations and communicate directly with creditors, stakeholders, customers and suppliers in connection with the Liquidating Plan.
    - The CRO will follow the roles and responsibilities as defined by the Manager of the Client, as provided in the Company Resolution approving the appointment of the CRO.

- Financial Advisory: The CRO will be supported by other Armanino team members who will be assigned to the Liquidating Plan development and execution, and the Armanino will advise as follows:
    - Validate, review/revise, and if needed develop, a plan for the Company and subsidiaries to liquidate.

Declaration Exhibit 1 Page 0020

Rosland Capital LLC
June 18, 2026

- Assess cash and liquidity of the Client and subsidiary, identify cost-saving opportunities and determining if value exists to the parent and developing plan to monetize such value and supporting the execution of such Liquidating Plan.

- Work with the existing stakeholders to identify the additional value for the Liquidating Plan and include in the plan.

- Perform other duties and activities as may be agreed to by the Court, stakeholders and Armanino from time-to-time.

## *Phase 3 - Sale Advisory*

- Advisory: supporting the Client on the monetization of the Clients assets and advising the Client on general issues, approaches and Client's sale process, including:

  - Preparation of a sale memo and outreach language

  - Research potential targets to approach

  - Outreach to potential targets, manage communications and lead meetings with same

  - Compile requisite information, create data room and support buyer diligence

  - Negotiate and structure deal.

## *Additional Services*

Armanino shall assist Client in such Additional Services upon request and agreement with Client. Additional Services shall be defined as spending more than four (4) hours for work on any issues not identified prior to the engagement or which requires significant efforts beyond those contemplated in the Agreement.

## FEES

Services performed under this Agreement will be charged as follows:

## *Phase 1 & 2 - Strategic Advisory and CRO*

- Armanino will charge on an hourly basis for this phase at Armanino's standard Hourly Rates shown herein if such services are requested by Client.

## *Phase 3 - Sale Advisory*

- Initial Sale Advisory Fee of thirty thousand dollars ($30,000), which is non-refundable and payable at the initiation of this phase.

- Monthly Sale Advisory Fee: a monthly fee (the "Monthly Sale Fee") of twelve thousand five hundred dollars ($12,500) per month, starting 30 days after initiating this phase, which is non-refundable and payable at the beginning of each monthly period.

- Completion Sale Advisory Fee: a fee of seventy-five thousand dollars ($75,000) for a recovery related to this process, which is payable from the recovery proceeds and due on collection of such recovery.

Declaration Exhibit 1 Page 0021

- Notwithstanding the foregoing: (i) the Completion Sale Advisory Fee shall not exceed twenty percent (20%) of the recovery proceeds; and (ii) to the extent that the Company does not have sufficient funds for the payment of the Sale Advisory fees, such amounts shall be payable upon receipt of the proceeds from such sale.

### *Additional Services*

- Additional Services will be provided at Armanino's standard Hourly Rates that range from $195 to $695 per hour.

### *Hourly Rates:*

Current hourly rates for Armanino's regular and Additional Services are:

| | Armanino's Representative | Rate |
|---|---|---|
| 1. | Partners | $495 - $695 |
| 2. | Senior or Managing Director | $440 - $615 |
| 3. | Directors | $390 - $515 |
| 4. | Managers | $250 - $395 |
| 5. | Consultants and Staff | $195 - $295 |

Client agrees that the aforementioned rates may be modified from time to time, including promotions, and Armanino will provide notice to Client of such change beyond standard annual rate changes at the beginning of each year.

Declaration Exhibit 1 Page 0022

# EXHIBIT 2

Declaration Exhibit 2 Page 0023

**WRITTEN CONSENT OF THE SOLE MEMBER AND SOLE DIRECTOR OF
ROSLAND CAPITAL, LLC.**

**July 1, 2026**

The undersigned, being the sole member and the sole Director (collectively the "Member") of Rosland Capital LLC., a Delaware limited liability company (the "Company"), does hereby consent to, adopt and approve, ratify, and confirm by this written consent, in each case pursuant to and in accordance with (a) the provisions of the Company's Second Amended and Restated Limited Liability Company Agreement dated November 1, 2013 as amended, and the applicable provisions of the Delaware Limited Liability Company Act (the "Act"), the following resolutions and authorize the taking of all actions contemplated hereby:

**WHEREAS**, the Company is governed by the Second Amended and Restated Limited Liability Company Agreement dated November 1, 2013 as amended by that certain Amendment No. 1 dated February 20, 2017 (collectively the "Operating Agreement");

**WHEREAS,** Section 6.1 of the Operating Agreement provides in part that:

> The business and affairs of the Company shall be managed by, or under the direction of, the Members; provided, however, that the Members shall appoint a Board of Directors to oversee and control the business and affairs of the Company on behalf of the Members in the manner and to the extent set forth herein: The Board of Directors shall consist of between two (2) and five (5) individuals who shall be appointed as set forth herein. Except as otherwise provided under this Agreement, the Board of Directors shall have power to direct the management and control the property and affairs of the Company, and to do all such lawful acts and. things which, in their judgment and discretion, they may deem necessary and appropriate for the expedient conduct and furtherance of the Company's Business.

**WHEREAS**, in light of the fact that there is a single Member and single Director of the Company, it is no longer necessary to have a Board of Directors;

**WHEREAS**, the Member has reviewed and considered the financial and operational condition of the Company, and the Company's business on the date hereof, including the assets of the Company, and the immediate cash flow needs of the Company, and the recommendations of the Company's legal and other advisors as to the alternatives available to the Company including pursuing a bankruptcy liquidation proceeding for the Company under the provisions of chapter 11 of title 11 of the United States Code (the "Chapter 11 Case");

**WHEREAS**, the Member has determined that it is in the best interests of the Company and the Company's stakeholders, creditors, and other interested parties for the Company to cease operations and promptly thereafter to commence a liquidating case under the provisions of chapter 11 of the Bankruptcy Code ("Liquidating Plan");

75837-00002/8095220.1

Declaration Exhibit 2 Page 0024

**WHEREAS**, to assist the Company in its efforts to wind down and cease operation and to file the Chapter 11 Case, it is appropriate to appoint a Chief Restructuring Officer ("CRO") and to grant the CRO broad powers to implement the foregoing.

## MODIFCATION OF OPERATING AGREEMENT

**RESOLVED,** Section 6 of the Operating Agreement shall be deleted in its entirety and replaced by the following:

"Section 6: **MANAGEMENT**. The Company shall be member managed. The rights of the member to manage the Company shall in all respects be limited to the delegation of authority to the CRO as set forth in this Written Consent.

## CESSATION OF OPERATIONS

**RESOLVED**, that the Company shall immediately cease all ordinary course business operations, and that no further business activity shall be undertaken except as necessary to preserve and protect the assets of the Company, to wind down existing affairs, or as authorized in connection with the Chapter 11 Case; and

**FURTHER RESOLVED**, that the CRO is authorized and directed to take all actions necessary or appropriate to implement and effectuate the cessation of operations, including, without limitation, terminating employees, terminating or assigning contracts and leases, closing bank accounts, and notifying applicable governmental authorities and third parties of the Company's cessation of operations.

## APPOINTMENT OF CHIEF RESTRUCTURING OFFICER

**RESOLVED**, that Michael Hogan is hereby appointed as the Chief Restructuring Officer of the Company (the "CRO"), effective immediately, to serve in such capacity until the earliest of: (i) the confirmation of a plan in the Chapter 11 Case; (ii) the conversion of the Chapter 11 Case to one under Chapter 7 of the Bankruptcy; (iii) the appointment of a Chapter 11 trustee; or (iv) the resignation of the CRO; and

**FURTHER RESOLVED**, that the CRO shall have the broadest possible authority to manage and direct all affairs of the Company, including, without limitation, the following powers and authority:

(a)    to manage and oversee the cessation of all business operations of the Company;

(b)    to negotiate, execute, and deliver any and all agreements, documents, instruments, and certificates on behalf of the Company as the CRO deems necessary or appropriate;

75837-00002/8095220.1

Declaration Exhibit 2 Page 0025

(c) to retain and compensate professionals, advisors, consultants, and agents, including legal counsel, financial advisors, and investment bankers, as the CRO deems necessary or appropriate;

(d) to open, maintain, and close bank and financial accounts, and to direct the disbursement of funds, on behalf of the Company;

(e) to sell, transfer, assign, encumber, or otherwise dispose of any and all assets of the Company, in whole or in part, through any commercially reasonable process, including through proceedings before the Bankruptcy Court;

(f) to terminate, assume, assign, or reject contracts, leases, and other agreements to which the Company is a party;

(g) to hire, terminate, and manage Company personnel, including the authority to determine compensation, severance, and related matters;

(h) to take all actions necessary or appropriate to preserve, protect, and maximize the value of the Company's assets for the benefit of creditors and other stakeholders;

(i) to commence, prosecute, settle, or dismiss litigation, arbitration, or other proceedings on behalf of the Company;

(j) to file, amend, and prosecute all tax returns, regulatory filings, and other governmental submissions on behalf of the Company;

(k) to make all decisions with respect to the Chapter 11 Case, including the prosecution and administration thereof; and

(l) to take any and all other actions that the CRO, in the CRO's sole and absolute discretion, deems necessary, appropriate, or advisable in connection with the cessation of operations, the Chapter 11 Case, or the wind-down of the Company.

**FURTHER RESOLVED**, that the CRO shall have authority to act as the sole authorized representative of the Company in the Chapter 11 Case, with full authority to bind the Company in all matters related thereto;

**FURTHER RESOLVED** that the CRO shall be indemnified by the Company to the full extent that is legally permitted and provided in the Operating Agreement of the Company; and

**FURTHER RESOLVED**, that any prior authority of any officer, manager, or member of the Company to act on behalf of the Company with respect to any matter within the scope of the CRO's authority as set forth herein is hereby superseded by the authority granted to the CRO pursuant to this Consent, and all officers, managers, members, employees, and agents of the Company are hereby directed to cooperate fully with the CRO and to take no action that would interfere with the CRO's exercise of authority.

75837-00002/8095220.1

Declaration Exhibit 2 Page 0026

## COMMENCEMENT AND PROSECUTION OF CHAPTER 11 CASE

**RESOLVED**, that it is desirable and in the best interests of the Company, the creditors of the Company, and other stakeholders and interested parties of the Company, that a voluntary petition (the "Petition") be filed by the Company with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") under the provisions of chapter 11 of the Bankruptcy Code; and it is further

**RESOLVED**, that the form, terms and provisions of, the execution, delivery and filing of, and the performance of the transactions and obligations contemplated by the Petition be, and they hereby are, authorized, approved and adopted in all respects and that the CRO be, and hereby is, authorized (an "Authorized Person"), directed, and empowered on behalf of and in the name of the Company (i) to execute and verify the Petition and all documents ancillary thereto, and to cause the Petition to be filed with the Bankruptcy Court commencing a Chapter 11 Case, and to make or cause to be made prior to the execution thereof any modifications to such Petition or ancillary documents, and (ii) to execute, verify, and file or cause to be filed, or to designate other manager or officers of the Company to execute, verify, and file or cause to be filed (in which even such persons shall also be Authorized Person), schedules, lists, motions, applications, declarations, affidavits, and other papers or documents necessary, appropriate, or desirable in connection with the foregoing, with such changes, additions, and modifications thereto as the CRO.

## PROFESSIONALS

**RESOLVED,** that the Company shall engage Armanino Advisory, LLC ("Armanino") to advise and support the CRO in connection with the cessation of operations and the Chapter 11 Case on the terms set forth in their engagement letter with the Company, which are hereby ratified and approved, and to represent and assist the CRO in carrying out its duties under the Bankruptcy Code.

**RESOLVED**, that the law firm Greenberg Glusker Fields Claman & Machtinger LLP ("GG") as the Company's general bankruptcy counsel shall be, and hereby are, authorized, empowered, and directed to represent the Company, as a debtor and debtor-in-possession, in connection with the Chapter 11 Case on the terms set forth in the engagement letter with the Company, which is hereby ratified and approved, and to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including to (a) execute, acknowledge, deliver, and verify the Petition and all other ancillary documents, and to cause the Petition to be filed with the Bankruptcy Court and make or cause to be made, prior to execution thereof, any modifications to the Petition or any ancillary document as the Authorized Persons deems necessary, desirable, or appropriate to carry out the intent and accomplish the purpose of these resolutions, (b) execute, acknowledge, deliver, verify, and file or cause to be filed all petitions, schedules, statements, lists, motions, applications and other papers or documents necessary or proper in connection with the foregoing, and (c) execute, acknowledge, deliver, and verify any and all other documents necessary or proper in connection therewith and to administer the Bankruptcy Case in form or forms as the Authorized Persons

may deem necessary or proper in order to effectuate the purpose of the intent of the foregoing resolution; and in connection therewith, the Authorized Persons, with power of delegation, are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of such counsel in the Bankruptcy Case; and it is further

**RESOLVED**, that GG is authorized and empowered to identify a noticing agent to represent and assist the Company as claims and noticing agent and administrative advisor and in carrying out its duties under the Bankruptcy Code, and for such noticing agent to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the CRO is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of the noticing agent; and it is further

**RESOLVED**, that the CRO be, and hereby is , authorized and directed to employ any other professionals to assist the Company in carrying out the Company's duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the CRO, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of any other professionals as necessary

## EFFECTIVENESS OF CONSENT

**RESOLVED,** that his Written Consent shall become effective on the later of: (i) July 1, 2026; or (ii) 24 hours prior to filing of the Petition with the Bankruptcy Court.

## GENERAL

**RESOLVED**, that all of the acts and transactions relating to matters contemplated by the foregoing resolutions, which acts and transactions would have been authorized and approved by the foregoing resolutions except that such acts and transactions were taken prior to the adoption of these resolutions, be, and they hereby are, in all respects confirmed, approved, and ratified; and it is further

**RESOLVED**, that a DocuSign, facsimile or photostatic copies of signatures to this consent shall be deemed to be originals and may be relied on to the same extent as the originals.

**SOLE MEMBER AND SOLE DIRECTOR**

DocuSigned by:

*Marin Aleksov*

A5123A81760C48F...

**Marin Aleksov**

75837-00002/8095220.1

Declaration Exhibit 2 Page 0028

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Greenberg Glusker Fields Claman & Machtinger LLP, 2049 Century Park East, Suite 2600, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (specify): **DECLARATION OF MICHAEL HOGAN IN SUPPORT OF FIRST DAY MOTIONS** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) July 2, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Brian L. Davidoff    bdavidoff@greenbergglusker.com, calendar@greenbergglusker.com;jking@greenbergglusker.com;cmillerwatkins@greenbergglusker.com;MilanaECF@ggfirm.com**
- **Steven Phillip Ordaz    sordaz@bmcgroup.com, tfeil@bmcgroup.com**
- **David Samuel Shevitz    David.S.Shevitz@usdoj.gov**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) July 2, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Via Messenger
The Honorable Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1534
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 07/02/2026 | Cynthia Miller Watkins | | */s/ Cynthia Miller Watkins* |
|---|---|---|---|
| Date | Printed Name | | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

75837-00002/8110823.1