BRIAN L. DAVIDOFF (SBN 102654)
BDavidoff@ggfirm.com
JONATHAN S. SHENSON (SBN 184250)
JShenson@ggfirm.com
JONATHAN J. BOUSTANI (SBN 274748)
JBoustani@ggfirm.com
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone: 310-553-3610
Facsimile: 310-553-0687

Attorneys for Debtor Rosland Capital LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re:

Rosland Capital LLC,

Debtor.

Case No. 2:26-bk-16650-BB

Chapter 11

**DEBTOR'S NOTICE OF MOTION AND MOTION FOR AN ORDER APPROVING (I) APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN AND (II) SALE OF CUSTOMER INFORMATION ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS**

**MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF MICHAEL HOGAN**

<u>Hearing for Appointment of Ombudsman</u>
Date: TBD
Time: TBD

<u>Hearing on Sale Motion</u>
Date: TBD
Time: TBD

Place: Courtroom 1539
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street
Los Angeles, California 90012
(or via ZoomGov per posted procedures



GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, CREDITORS, ALL PARTIES-IN-INTEREST HEREIN, AND THEIR RESPECTIVE COUNSEL**:

**PLEASE TAKE NOTICE** that Rosland Capital LLC, the debtor and debtor in possession in the above-captioned case ("Debtor"), shall and does hereby move (the "Motion"), pursuant to sections 105(a), 332, and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for the entry of orders approving: (1) the appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 332 and 363(b)(1)(B) (the "Ombudsman Appointment"); and (2) the sale of the Customer Information Assets (defined below) free and clear of all liens, claims, and interests under Bankruptcy Code section 363 to the Successful Bidder through an asset purchase agreement substantially in the form attached as **Exhibit A** (the "APA").[1]

**PLEASE TAKE FURTHER NOTICE** that the term "Customer Information Assets" does not mean and excludes: (a) Debtor's subscription agreement or license with Salesforce, Inc., any Salesforce software or platform rights, or any hardware, and (b) Excluded Information including Social Security and other government-issued identification numbers and credit card, debit card, financial account, and bank account numbers. The Debtor's estate will retain a copy of the Customer Database and a non-exclusive right to use and analyze the data contained therein solely for purposes of investigating, prosecuting, settling, and administering claims and causes of action of the estate, including avoidance actions under chapter 5 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the relief sought herein is based upon these moving papers, the accompanying Memorandum of Points and Authorities, the accompanying

---

[1] The term "Customer Information Assets" means and includes Debtor's right, title, and interest in and to the Customer Database, including, without limitation: (i) all customer records, such as business or personal names, mailing addresses, email addresses, telephone numbers, and other contact information; (ii) all transaction and purchase histories, account records, and order data; (iii) all activity records, call logs, notes, and correspondence histories associated with such customers; (iv) all tags, segmentation data, custom fields, and associated metadata contained within the Customer Database; and (v) all electronic files, exports, reports, and copies of the foregoing, in whatever form or medium maintained, together with the trade names, trademarks, service marks, logos, designs, and goodwill identified and the domain names, websites, URLs, and related digital properties associated with the Debtor's business. This includes all prospective customer records, leads, opportunities, and related activity records maintained within the Customer Database.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Declaration of Michael Hogan ("Hogan Decl. 2"), the Declaration of Michael Hogan in Support of the First Day Motions [Dkt. No. 5] ("Hogan Decl. 1"), the records and pleadings in this case, the arguments and representations of counsel, and any oral or documentary evidence presented at or prior to the time of the hearing. The following exhibits are attached to and filed with the Motion: Exhibit A — form of Asset Purchase Agreement; Exhibit B — Privacy Policy; Exhibit C — Terms of Service, and Exhibit D — Bid Guidelines.

WHEREFORE, for the reasons set forth in the accompanying Memorandum of Points and Authorities, Debtor requests that the Court grant the Motion and such other and further relief as is appropriate under the circumstances.

Respectfully Submitted,

DATED: August 19, 2026

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP

By: /s/ Jonathan Shenson
JONATHAN SHENSON (SBN 184250)
Counsel for Debtor
Rosland Capital LLC

# TABLE OF CONTENTS

Page


I. JURISDICTION & VENUE ..... 8
II. RELEVANT FACTUAL BACKGROUND ..... 8
  A. Debtor's Business. ..... 8
  B. Customer Information Assets. ..... 9
  C. Marketing of the Customer Information Assets. ..... 10
  D. Bid Guidelines. ..... 11
  E. Proposed Asset Purchase Agreement. ..... 14
  F. Proposed Schedule Sale Hearing, and Related Deadlines. ..... 15
III. LEGAL BASIS FOR RELIEF ..... 15
  A. Debtor's Proposed Sale is an Exercise of Sound Business Judgment. ..... 15
  B. Notice of the Proposed Sale is Reasonable and Appropriate. ..... 16
  C. The Assets Can Be Sold Free and Clear of Liens, Claims, or Interests. ..... 17
  D. The Proposed Sale is in Good Faith. ..... 18
  E. The Transfer Is Consistent with the Privacy Policy and Permitted Under Section 363(b)(1)(A); Alternatively, the Court Should Appoint a Consumer Privacy Ombudsman Under Section 363(b)(1)(B); and the Transfer Violates No Applicable Non-bankruptcy Law. ..... 19
    1. The Proposed Transfer Is Consistent with the Debtor's Privacy Policy and Is Authorized by Section 363(b)(1)(A). ..... 20
    2. The Proposed Transfer does not Violate non-bankruptcy law. ..... 22
    3. There is Good Cause for the Appointment of an Ombudsman. ..... 23
  F. The Court Should Waive the Stay Under Bankruptcy Rule 6004(h). ..... 24
IV. CONCLUSION ..... 25


GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**


*Ewell v. Diebert*,
958 F.2d 276 (9th Cir. 1992) ........ 19

*FutureSource LLC v. Reuters Ltd.*,
312 F.3d 281 (7th Cir. 2002) ........ 18

*Hargrave v. Twp. of Pemberton*,
175 B.R. 855 (Bankr. D.N.J. 1994) ........ 18

*Hoese Corp. v. Vetter Corp.*,
724 F.2d 52 (7th Cir. 1983) ........ 19

*In re 23andMe Holding Co.*,
674 B.R. 487 (Bankr. E.D. Mo. 2025) ........ 22

*In re Abbotts Dairies, Inc.*,
788 F.2d 143 (3d Cir. 1986) ........ 18, 19

*In re American Dev. Corp.*,
95 B.R. 735 (Bankr. C.D. Cal. 1989) ........ 15

*In re Channel One Commc'ns, Inc.*,
117 B.R. 493 (Bankr. E.D. Mo. 1990) ........ 18

*In re Highway Equip. Co.*,
61 B.R. 58 (Bankr. S.D. Ohio 1986) ........ 16

*In re Ionosphere Clubs, Inc.*,
100 B.R. 670 (Bankr. S.D.N.Y. 1989) ........ 16

*In re Kellstrom Indus., Inc.*,
282 B.R. 787 (Bankr. D. Del. 2002) ........ 18

*In re Pomona Valley Med. Group, Inc.*,
476 F.3d 665 (9th Cir. 2007) ........ 16

*Lewis v. Anderson*,
615 F.2d 778 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980) ........ 16

*Simantob v. Claims Prosecutor, L.L.C.*,
325 B.R. 282 (B.A.P. 9th Cir. 2005) ........ 15, 17

*Walter v. Sunwest Bank*,
83 B.R. 14 (B.A.P. 9th Cir. 1987) ........ 15

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**FEDERAL STATUTES**

11 U.S.C. § 101(41A) .......... 20
11 U.S.C. § 105(a) .......... 8
11 U.S.C. § 332 .......... 8
11 U.S.C. § 332 .......... 8
11 U.S.C. § 363 .......... 8
11 U.S.C. § 363(b) .......... 15
11 U.S.C. § 363(b)(1) .......... 15, 16, 18, 20
11 U.S.C. § 363(b)(1)(B) .......... 8
11 U.S.C. § 363(b)(1)(B)(ii) .......... 22
11 U.S.C. § 363(f) .......... 15, 17, 18
11 U.S.C. § 363(m) .......... 15, 19
11 U.S.C. § 503(b) .......... 12
11 U.S.C. §§ 1101 *et seq.* .......... 8
28 U.S.C. § 157 .......... 8
28 U.S.C. § 1334 .......... 8
28 U.S.C. § 1408 .......... 8
28 U.S.C. § 1409 .......... 8
Bankruptcy Code chapter 5 .......... 10, 14
Federal Trade Commission Act § 5 .......... 22

**CALIFORNIA STATUES**

Cal. Civ. Code § 1798.140 .......... 22
California Consumer Privacy Act .......... 21

**OTHER STATE STATUTES**

*Neb. Rev. Stat.* § 87-1102 .......... 22
*Tex. Bus. & Com.* Code § 541.001(28)(E) .......... 22

**OTHER AUTHORITIES**

Bankruptcy Rule 2002(c)(1) .......... 16

Bankruptcy Rule 6004(h) .......... 24
Fed. R. Bankr. P. 2002 .......... 8
Fed. R. Bankr. P. 2002(a)(2) .......... 16
Fed. R. Bankr. P. 2002(c)(1) .......... 16
Fed. R. Bankr. P. 6004 .......... 8
Fed. R. Bankr. P. 6004(a) .......... 16
Fed. R. Bankr. P. 6004(h) .......... 24
Fed. R. Bankr. P. 9014 .......... 8
Local Rule Rule 2002 .......... 17
Local Rule Rule 6004 .......... 17

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

## MEMORANDUM OF POINTS AND AUTHORITIES

Rosland Capital LLC, the debtor in the above-captioned case ("Debtor"), makes this motion (the "Motion") pursuant to sections 105(a), 332, and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order approving: (1) the appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 332 and 363(b)(1)(B); and (2) the sale of the Customer Information Assets free and clear of all liens, claims, and interests under Bankruptcy Code section 363, to the Successful Bidder pursuant to an asset purchase agreement substantially in the form attached as **Exhibit A** (the "APA").

In support of the Motion, the Debtor respectfully states as follows:

## I. JURISDICTION & VENUE

The Court has jurisdiction over this case, the Debtor's estate and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the case is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtor remains in possession of its assets pursuant to 11 U.S.C. §§ 1101 *et seq.* Michael Hogan has been appointed as the Chief Restructuring Officer ("CRO") of the Debtor, subject to Court approval.

## II. RELEVANT FACTUAL BACKGROUND

### A. Debtor's Business.

Until recently, the Debtor marketed and sold gold, silver, platinum, and other precious metals to retail consumers throughout the United States. Hogan Decl. 1 at ¶ 12. Debtor advertised and marketed its products on, or through, Fox News, Newsmax, Google, Bing, AI, Debtor's website, and other channels. *Id.* ¶ 17. Customers generally learned of the Debtor's products through these channels, contacted the Debtor, communicated with the Debtor's sales representatives, and then purchased the Debtor's products through those representatives. *Id.* Periodically, the Debtor also directed marketing calls to customers who had previously contacted the Debtor. *Id.* The Debtor's business model relied heavily upon direct marketing, customer relationships, and proprietary customer databases developed over many years. *Id.*

The Debtor's privacy policy in effect on the Petition Date, a copy of which is attached as

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**Exhibit B** (the "Privacy Policy"), carries an original effective date of September 2, 2008 and was last modified effective January 1, 2023. The Privacy Policy is incorporated by reference into the Debtor's Terms of Service, a copy of which is attached as **Exhibit C** (the "TOS"), and each customer accountholder accepted the Privacy Policy in agreeing to the TOS.

**B. Customer Information Assets.**

In recent years, the Debtor experienced financial distress and became unable to satisfy all customer demands and other creditor claims as they become due. *Id.* at ¶¶ 12, 18-30. As a result, the Debtor ceased its operations and filed its bankruptcy petition. *Id.* at ¶¶ 31-34. The Debtor no longer possesses any inventory of precious metals, coins, or bullion, and has limited funds in its financial accounts. *Id.* at ¶ 35.

The Debtor's remaining operational assets consist of the following (the "Customer Information Assets"): the Debtor's right, title, and interest in and to the Customer Database, including, without limitation: (i) all customer records, such as business or personal names, mailing addresses, email addresses, telephone numbers, and other contact information; (ii) all transaction and purchase histories, account records, and order data; (iii) all activity records, call logs, notes, and correspondence histories associated with such customers; (iv) all tags, segmentation data, custom fields, and associated metadata contained within the Customer Database; and (v) all electronic files, exports, reports, and copies of the foregoing, in whatever form or medium maintained, together with the trade names, trademarks, service marks, logos, designs, and goodwill identified on Schedule 1 to the APA and the domain names, websites, URLs, and related digital properties associated with the Debtor's business identified on Schedule 2 to the APA. The Customer Information Assets also include all prospective customer records, leads, opportunities, and related activity records maintained within the Customer Database. *Notwithstanding the foregoing, the Customer Information Assets exclude, and the Debtor is not selling, transferring, or otherwise conveying, (a) the Debtor's subscription agreement or license with Salesforce, Inc., any Salesforce software or platform rights, or any hardware, and (b) the Excluded Information identified in the APA, including Social Security and other government-issued identification numbers and credit card, debit card, financial account, and bank account numbers.*

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

Notwithstanding the sale of the Customer Information Assets, the Debtor's estate shall retain one complete copy of the Customer Database, excluding the Excluded Information (the "Estate Copy"), and a non-exclusive, perpetual, irrevocable, royalty-free right to access, use, and analyze the data contained therein solely for purposes of investigating, prosecuting, settling, and administering claims and causes of action of the estate, including avoidance actions under chapter 5 of the Bankruptcy Code, and otherwise administering the estate, which right may be exercised by, and is assignable without the Buyer's consent to, the Committee, any trustee appointed in this case, and any liquidating trust established under a confirmed plan, as provided in Section 7(a)(iv) of the APA.

**C. Marketing of the Customer Information Assets.**

Two weeks prior to the petition date, on or about June 18, 2026, the Debtor retained Armanino Advisory LLC ("Armanino") to provide strategic assessment and financial advice in connection with the liquidation of the Debtor's business. *Id.* at ¶ 1. Pursuant to the Debtor's engagement of Armanino and subject to the Court's approval, the Debtor appointed Michael Hogan, a partner at Armanino, to serve as CRO of the Debtor with broad authority to develop and execute a plan to liquidate the Debtor's assets. *Id.* at ¶ 1. In consultation with the Debtor's management, professionals, and advisors, the CRO and the Debtor determined that a liquidating chapter 11 proceeding provides the best opportunity to maximize value for creditors, provide transparency for creditors/customers and administer claims in an orderly and efficient manner. *Id.* at ¶¶ 31-32. Specifically, the CRO and the Debtor determined that, in their business judgment, the Customer Information Assets are significantly more likely to realize value through a structured, court-supervised marketing and sale process than through an immediate chapter 7 liquidation. *Id.* at ¶ 36. Thereafter, the Debtor filed its bankruptcy petition on July 2, 2026.

Armanino has been marketing the Customer Information Assets and communicating with potential purchasers of the Customer Information Assets including participants in the precious metals industry, other retail businesses serving comparable customers, financial services businesses, and other strategic purchasers positioned to succeed to the Debtor's business and to use the Customer Information Assets consistent with the Privacy Policy that may derive value from the Customer Information Assets. Hogan Decl. 2 at ¶ 10. To date, three potential purchasers have

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

expressed a serious interest in purchasing the Customer Information Assets. *Id.* at ¶ 14.

In developing the list of potential purchasers, Armanino researched strategic acquirers operating within the Debtor's industry niche, as well as financial sponsors with relevant investment activity and portfolio companies that could benefit from the Customer Information Assets. Armanino also leveraged its internal database to identify organizations with a demonstrated interest in investing in this sector. *Id*. at ¶ 11.

Armanino initiated its outreach by sending an introductory email describing the Debtor and the Customer Information Assets. The email outlines the diligence process and bid submission requirements and includes a brief sale memorandum summarizing the opportunity. Interested parties may execute a non-disclosure agreement ("<u>NDA</u>") through a link provided in the email, which, upon execution of the NDA, grants access to a virtual data room containing additional information regarding the Debtor's business. *Id*. at ¶ 12.

A key component of the data room is a redacted sample of the Debtor's customer and prospect data. While the sample does not reveal the identities of any specific customers or leads, it provides potential acquirers with insight into the structure, quality, and composition of the data assets being offered for sale. Requests for additional diligence are reviewed, and access granted, on a case-by-case basis. *Id*. at ¶ 13.

**D. <u>Bid Guidelines.</u>**

The Debtor has issued Bid Guidelines for becoming a Qualified Bidder, a copy of which is attached as **Exhibit D**, and summarized as follows:

*Participation Requirements*. To participate in the bidding process, a person or entity (a "<u>Potential Bidder</u>") must deliver (i) an executed confidentiality agreement on terms acceptable to the Debtor, (ii) information demonstrating the financial capability to consummate the sale, including its most current audited and latest unaudited financial statements (or, if the Potential Bidder is an entity formed to acquire the Customer Information Assets, the financial statements of, or a written funding commitment from, its equity holders), (iii) a letter of intent which includes the proposed purchase price and (iv) a redline draft of the APA detailing all requested changes,

*Qualified Bidders; Due Diligence.* A "<u>Qualified Bidder</u>" is a Potential Bidder (i) whose

financial disclosure demonstrates the capability to consummate the sale, (ii) whose Bid is a Qualified Bid, (iii) that will acquire the Debtor's trade names, trademarks, goodwill, domain names, and websites together with the customer information, so that it assumes control of the Debtor's business and not merely its records, meaning a business that will use the customer information for the purposes disclosed in the Privacy Policy and in a manner consistent with the promises made to customers when the information was collected, (iv) whose stated intended use of the customer information is limited to the purposes disclosed in the Privacy Policy, and (v) that has agreed in writing to comply with the Privacy Policy as in effect on the Petition Date and to accept the conditions described below, as determined by the Debtor in consultation with the Committee.

*Bid Requirements*. Each Bid must, among other things: (i) disclose the legal identity of the bidder and of all persons sponsoring, financing, or participating in the Bid, together with any past or present connections to the Debtor or any other bidder; (ii) set forth the components of the purchase price; (iii) include a written representation that the bidder has not engaged in any collusion with respect to the bidding and that its Bid is a good-faith, bona fide offer; (iv) be accompanied by a cash deposit equal to $125,000, to be held in a segregated, non-interest-bearing account (the "Deposit"), subject to the Debtor's right to increase the Deposit requirement; (v) include a duly executed APA marked to show all changes requested by the bidder, together with all other material transaction documents; (vi) include committed financing documentation to the extent the Bid is not supported by cash on hand; (vii) not be conditioned on financing, any internal approval, or the outcome of due diligence; (viii) be reasonably likely to close on or before October 2, 2026; (ix) be binding and irrevocable in accordance with the Bid Guidelines; (x) waive any right to a break-up fee, expense reimbursement, or similar compensation, including under section 503(b) of the Bankruptcy Code; (xi) include evidence of corporate authorization to submit the Bid and consummate the transaction; (xii) acknowledge that the sale is on an "as-is, where-is" basis without reliance on any representation other than as expressly set forth in the bidder's Bid or APA; (xiii) consent to the jurisdiction of the Court and waive any right to a jury trial with respect to disputes arising from the qualification of bids, the Bid Guidelines, the transaction documents related to the sale, and the closing; and (xiv) agree that those conditions will be embodied in the Approval Order

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

and in the APA. Bids must be received by email by the Notice Parties on or before 5:00 p.m. (prevailing Pacific Time) on September 14, 2026 (the "Bid Deadline").

*Auction.* The Debtor does not presently intend to conduct an auction for the Customer Information Assets. If the Debtor receives more than one Qualified Bid on or before the Bid Deadline, the Debtor reserves the right, but is not obligated, to conduct an auction among the Qualified Bidders. If the Debtor elects to conduct an auction, it will provide written notice of that election to each Qualified Bidder and the Committee setting forth the date, time, and place (or remote means) of the auction and the terms and procedures that will govern it, including any minimum overbid increment, and each participating Qualified Bidder must confirm on the record that it has not engaged in collusion and that its Bid is a good faith, bona fide offer.

*Selection of the Successful Bid.* Whether or not an auction is conducted, the Debtor will determine the highest or otherwise best Qualified Bid, in its reasonable business judgment and in consultation with the Committee, which Bid will be the "Successful Bid" and such Qualified Bidder the "Successful Bidder." The Debtor's acceptance of any Successful Bid is conditioned upon approval of the Court at the Sale Hearing.

*Return of Deposits.* The Successful Bidder's Deposit will be applied to the purchase price at closing. Deposits of Qualified Bidders other than the Successful Bidder will be returned on or within five (5) business days after the Sale Hearing, and the Deposit of any Potential Bidder determined not to be a Qualified Bidder will be refunded on or within five (5) business days after the Bid Deadline. If the Successful Bidder fails to consummate the sale because of its breach, the Debtor may retain the Deposit as damages, in addition to all other rights, remedies, and causes of action available to the Debtor.

*Sale Hearing; Reservation of Rights; Fiduciary Out.* The Debtor will present the Successful Bid to the Court for approval at the Sale Hearing, currently scheduled for September 30, 2026 at 1:00 p.m. (prevailing Pacific Time). The Debtor reserves the right, in its reasonable business judgment and in consultation with the Committee, to modify the Bid Guidelines in any manner that will best promote the goals of the bidding process, including by extending deadlines, adjourning the Sale Hearing in open court without further notice, adopting additional procedural rules, electing

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

to conduct or declining or cancelling an auction, and rejecting any or all bids. Nothing in the Bid Guidelines requires the Debtor to take or refrain from taking any action that, based on the advice of counsel, is required to comply with applicable law or the Debtor's fiduciary obligations.

**E. <u>Proposed Asset Purchase Agreement.</u>**

The key provisions of the APA are summarized as follows:

*Parties*. The APA is to be entered into between the Debtor, as Seller, and the Successful Bidder, as Buyer.

*Assets for Sale*. The Customer Information Assets.

*Estate Copy; Post-Closing Use*. The Debtor's estate retains the Estate Copy and a non-exclusive, perpetual, irrevocable, royalty-free license to access, use, and analyze it solely to investigate, prosecute, defend, settle, and administer claims and causes of action of the estate, including avoidance actions under chapter 5 of the Bankruptcy Code, assignable without the Buyer's consent to the Committee, any trustee, and any liquidating trust established under a confirmed plan, and subject to the confidentiality and data-security covenants set forth in the APA.

*Purchase Price.* The Purchase Price is not fixed as of the filing of this Motion. The Debtor's marketing process is ongoing and Bids are not due until the Bid Deadline. The Purchase Price will be the cash consideration offered in the Successful Bid, as determined through the bidding process and any auction the Debtor elects to conduct.

*Deposit*. $125,000 upon execution of the APA, to be held by Armanino.

*Closing.* The Closing occurs on the second (2nd) business day after entry of the Approval Order, or such other date as the parties agree in writing, but in no event later than the outside date set forth in the APA.

*No Assumed Liabilities*. The Buyer purchases the Assets only and assumes no liability, obligation, debt, commitment, or claim of the Debtor, whether known or unknown, accrued or contingent, and whether arising before, on, or after the Closing.

*"As Is" Sale*. The Assets are sold "AS IS, WHERE IS, WITH ALL FAULTS…."

*Free and Clear; Good Faith; Subject to Overbid*. The APA is conditioned upon entry of the Approval Order, which must authorize the Debtor's execution and performance of the APA,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

approve the transfer of the Assets free and clear of all Encumbrances pursuant to Bankruptcy Code sections 363(b) and 363(f), and find that the Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m).

*Taxes*. All transfer, sales, use, and similar Taxes arising from the transfer of the Assets are borne by the Buyer, and the Buyer must deliver an allocation of the purchase price among the Assets within 120 days after Closing, subject to the Debtor's reasonable consent.

**F. <u>Proposed Schedule Sale Hearing, and Related Deadlines.</u>**

The Debtor's proposed schedule for the auction, sale hearing, and related deadlines is as follows:

| **<u>EVENT</u>** | **<u>PROPOSED DATE</u>** |
|---|---|
| Bid Deadline | September 14, 2026, at 5:00 p.m. (Pacific Time) |
| Deadline to Object to Motion and Sale | September 16, 2026 |
| Debtor's Deadline to Provide Notice of Bids | September 15, 2026 |
| Deadline for Replies to Objections | September 22, 2026 |
| Auction (if any) | September 23, 2026, at 10:00 a.m. (Pacific Time) |
| Hearing on Motion and Sale Hearing | September 30, 2026, at 1:00 p.m. (Pacific Time) |
| Sale Closing | On or before October 2, 2026 |

## III. <u>LEGAL BASIS FOR RELIEF</u>

**A. <u>Debtor's Proposed Sale is an Exercise of Sound Business Judgment.</u>**

A debtor may sell assets pursuant to Bankruptcy Code section 363(b)(1) if it demonstrates sound business judgment for doing so. *In re American Dev. Corp.,* 95 B.R. 735, 739 (Bankr. C.D. Cal. 1989); *Walter v. Sunwest Bank*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1987) ("[T]here must be some articulated business justification for [selling] property outside the ordinary course of business"); *Simantob v. Claims Prosecutor, L.L.C.*, 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005) ("The court's obligation is to assure that optimal value is realized by the estate under the circumstances…Ordinarily, [the debtor in possession] is afforded deference, particularly where

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

business judgment is entailed in the analysis or where there is no objection.").[2]

The Debtor ceased operations pre-petition and is proceeding with an orderly liquidation and winddown of its affairs. Its remaining operational assets consist of the Customer Information Assets. Before filing this case, the Debtor carefully considered its options for monetizing the Customer Information Assets and concluded that selling these assets in bankruptcy via an auction process provides the best prospect for maximizing value under the circumstances.

The proposed timeline is appropriate under the circumstances. The universe of likely purchasers is known and finite—principally strategic acquirers and other participants in the precious metals industry, for whom the Customer Information Assets are a natural fit and who require little education about the assets or the Debtor's business. Also, the assets consist of discrete customer data that can be diligenced quickly using the materials already assembled in the data room. Finally, the market treats customer information of this type as a melting ice cube, so a prompt but competitive sale process therefore preserves value that a longer timeline would erode and its Bid Guidelines help ensure that the Debtor is working with serious, financially capable bidders.

**B. <u>Notice of the Proposed Sale is Reasonable and Appropriate.</u>**

Pursuant to Bankruptcy Rules 2002(a)(2), 2002(c)(1), and 6004(a), a debtor in possession is required to notify its creditors of any proposed sale of its assets, including a "general description of the property to be sold", "the time and place of any public sale", "the terms and conditions of any private sale", the "time to file objections", and "for a proposed sale or lease of personally identifiable information under §363(b)(1), a statement whether the sale is consistent with any policy that prohibits transferring the information."

As required by Bankruptcy Rule 2002(c)(1), the Notice states that the proposed transfer of

---

[2] Section 363(b)(1) does not require that the Court substitute its own business judgment for that of the debtor. *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986). Instead, the Court simply ascertains whether the debtor has articulated a valid business justification. *Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980). So, when a debtor proffers a rational business justification for the sale, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007).

the Customer Information Assets is consistent with the Debtor's Privacy Policy, which is the policy in effect on the Petition Date. The Debtor has made that determination after reviewing the Privacy Policy and the Terms of Service into which it is incorporated.

The Debtor will serve the Notice of Hearing (the "Notice of Hearing") on all creditors and other parties in interest, inclusive of the parties identified below on which the Debtor has served the Motion. The Debtor has served the Motion on (i) the Office of the United States Trustee; (ii) the Committee; and (iii) all Potential Bidders and other parties contacted by Armanino in connection with the marketing of the Customer Information Assets.

Debtor is also serving the Notice of Hearing on customers in accordance with this Court's *Order on Motion for an Order: (1) Authorizing Debtor to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals; (2) Authorizing the Debtor's Noticing Agent to Serve the Case Commencement Notice; and (3) Authorizing the Debtor to Limit the Scope of Notice* [Docket No. 20], the Court directed that "a sale of all or any part of the Debtor's customer list, in which event any customer whose data is the subject of the proposed sale shall be entitled to receive notice…" ("Limit Service Order"). The Customer Information Assets consists in part of a list on Salesforce of approximately 36,000 names, of which 14,500 have email addresses, and the balance of which (except 20 names), have physical addresses. Pursuant to the sales procedures outlined above the Debtor proposes to serve the Notice of Hearing by August 31, 2026. As to those customers with email addresses, the Debtor will serve the Notice of Hearing by email as permitted under the Limit Service Order. As to the approximately 21,500 customers for whom the Debtor has a physical address but no email address, the Debtor will serve the Notice of Hearing by first class mail concurrently with service by email.

The Debtor submits that the above-described service of the Notice of Motion and Motion and Notice of Hearing complies with Bankruptcy Rules 2002 and 6004, Local Rule 6004-1, and the Limit Service Order, and provides adequate notice of the relief requested in this Motion.

**C. The Assets Can Be Sold Free and Clear of Liens, Claims, or Interests.**

The Debtor requests that the sale of the Customer Information Assets be free and clear of any and all liens, claims, and interests in accordance with Section 363(f) of the Bankruptcy Code

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

and with any such liens, claims and interests attaching to the sale proceeds in the same order and priority in existence as of the Petition Date.[3]

Debtor is not aware of any liens on the Customer Information Assets. The relief requested under Bankruptcy Code section 363(f) is not intended to, and the Debtor does not request that the Approval Order purport to, extinguish, discharge, or otherwise impair any right of any consumer arising under the Debtor's Privacy Policy or under applicable state or federal privacy, consumer-protection, or unfair-practices law. To the extent any party asserting a lien, claim, or interest in the Customer Information Assets receives notice of the sale and does not file a timely written objection hereto, such party should be deemed to have consented to the sale of the assets free and clear of its asserted lien, claim, or interest. *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *see In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990).

**D. <u>The Proposed Sale is in Good Faith.</u>**

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). The purpose of such a finding is to provide a safe harbor

---

[3] Section 363(f) provides in relevant part that a debtor may sell "free and clear of any interest in such property of an entity" if one of the following five conditions is satisfied:

1. applicable non-bankruptcy law permits sale of such property free and clear of such interest;
2. such entity consents;
3. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
4. such interest is in bona fide dispute; or
5. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because Section 363(f) is written in the disjunctive, a debtor only needs to satisfy one of the five requirements to warrant approval of the sale of the Debtor's assets "free and clear." *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

for purchasers of a debtor's property when the purchase is made in "good faith." Section 363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m); *see Ewell v. Diebert*, 958 F.2d 276, 279 (9th Cir. 1992). Bankruptcy Code section 363(m) encourages good faith transactions and preserves the finality of the bankruptcy court's orders. *Abbotts Dairies*, 788 F.2d at 147; *Hoese Corp. v. Vetter Corp.*, 724 F.2d 52, 54-55 (7th Cir. 1983). The Customer Information Assets will be sold through a competitive, court-supervised process conducted under the Bid Guidelines — including an auction if the Debtor elects to conduct one in consultation with the Committee — that ensures an open and fair bidding process with the aim of maximizing value for the estate.

Accordingly, the Debtor requests that the Court find that any successful bidder is purchasing the Customer Information Assets in good faith.

**E. <u>The Transfer Is Consistent with the Privacy Policy and Permitted Under Section 363(b)(1)(A); Alternatively, the Court Should Appoint a Consumer Privacy Ombudsman Under Section 363(b)(1)(B); and the Transfer Violates No Applicable Non-bankruptcy Law.</u>**

The proposed transfer of the Customer Information Assets complies with the Debtor's Privacy Policy which expressly contemplates the transfer to a successor-in-interest. It also does not violate any applicable non-bankruptcy law: each of the three state privacy statutes that reach the Debtor excludes a transfer of this kind from what it regulates as a "sale." Consumer rights are not impaired in any event. Upon the Closing the Buyer becomes the controller of the transferred information and is subject in that capacity to every obligation those statutes impose. In any event, to further ensure that the interests of consumers who are not themselves before the Court are independently represented, the Debtor asks the Court to direct the appointment of a consumer privacy ombudsman under section 363(b)(1)(B).

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**1. The Proposed Transfer Is Consistent with the Debtor's Privacy Policy and Is Authorized by Section 363(b)(1)(A).**

The Customer Information Assets include personally identifiable information ("PII") within the meaning of Bankruptcy Code section 101(41A). Section 363(b)(1) of the Bankruptcy Code provides in relevant part as follows:

> "[I]f the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—
>
> (A) such sale or such lease is consistent with such policy; or
> (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—
>
> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
> (ii) finding that no showing was made that such sale or such lease would violate applicable non-bankruptcy law."

11 U.S.C. § 363(b)(1).

The Debtor's Privacy Policy does not prohibit the transfer of PII. Rather, it provides that "generally speaking, we will not disclose your personal information to third parties who are not our affiliates without your consent," and that the Debtor does "not sell or exchange customer lists or customer information for marketing purposes with unaffiliated third parties." By their terms, both provisions describe the Debtor's conduct in the ordinary course of its business. Neither speaks to a one-time transfer of the business and its assets to a successor.

The Privacy Policy separately and expressly addresses the transfer of PII as part of an asset sale (including bankruptcy) and permits it. Reading the general provisions to prohibit what the specific provisions expressly authorize would render the latter surplusage. The state statutes discussed below draw the same line.

Notably, with respect to third-party disclosure, the Privacy Policy expressly reserves the Debtor's right to disclose personal information without customer consent in enumerated

circumstances, the first of which is "Disclosure to Successors": the Debtor "may disclose your personal information to any actual or potential successor-in-interest of ours, such as a company that is seeking to acquire us." In other words, the Privacy Policy permits the Debtor to disclose the Customer Information Assets, in full, to multiple suitors in an acquisition or asset-sale posture. No reasonable consumer would understand the Privacy Policy to permit disclosure to potential acquirers yet somehow prohibit its transfer to the Debtor's actual successor.[4]

The Privacy Policy further discloses that the Debtor may use customers' personal information "[t]o evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of our assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal information held by us about our customers or Web Site users is among the assets transferred." The TOS in turn provides that it is binding upon each party "and its successors and permitted assigns." The proposed sale is the transaction these provisions contemplate: a transfer of the Debtor's assets, including personally identifiable information, to a successor-in-interest as part of a bankruptcy.[5]

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

[4] Even if "sell" were construed to encompass "transfer," the Privacy Policy's statement that the Debtor does not "generally speaking, sell or exchange customer lists or customer information for marketing purposes with unaffiliated third parties" would not apply to the proposed transaction. First, a reasonable consumer would understand the introductory phrase "generally speaking" to cabin what follows to the Debtor's practices as a going concern, from which the Debtor may depart in specific circumstances. Second, the qualifier "for marketing purposes" limits both "customer lists" and "customer information," and the Debtor is not transferring either for marketing purposes. The Customer Information Assets are being transferred as an integrated business: the Debtor's trade names, trademarks, service marks, logos, designs, and business goodwill, and its domain names, websites, and related digital properties, are conveyed together with the customer records to a single successor-in-interest that will stand in the Debtor's place. A transfer of a business and its brand, in which customer records are among the assets conveyed, would not be understood by a reasonable consumer as a sale or exchange of customer information for marketing purposes.

[5] The Privacy Policy also states, in the section summarizing rights of California residents, that the Debtor does not "sell or share" personal information within the meaning of the California Consumer Privacy Act and "will not do so in the future without providing you with notice and an opportunity to opt-out of such sale or sharing as required by law." "Sell" and "share" are terms of art defined by the California Consumer Privacy Act, and the Debtor's statement that it does not "sell or share" personal information is a statement about those defined practices. It is not an undertaking that the Debtor will never transfer personal information under any circumstances, and it does not displace the successor-in-interest and business-transfer disclosures set out above, which appear in the generally applicable portion of the Privacy Policy and expressly contemplate a transfer of personal information as part of a bankruptcy or liquidation proceeding.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**2. The Proposed Transfer does not Violate non-bankruptcy law.**

Bankruptcy Code section 363(b)(1)(B)(ii) requires a finding that no showing is made that the transfer would violate state laws restricting the transfer of PII; *In re 23andMe Holding Co.*, 674 B.R. 487 (Bankr. E.D. Mo. 2025). Privacy statutes in California, Texas, and Nebraska apply to the Debtor and each excludes the proposed transfer from what it regulates as a "sale." *Cal. Civ. Code* § 1798.140; *Neb. Rev. Stat.* § 87-1102; *Tex. Bus. & Com.* Code § 541.001(28)(E). Because the Buyer is assuming control of the Debtor's remaining assets, the proposed transfer falls within each exclusion. And because the transfer is not a "sale" within the meaning of these statutes, the opt-out rights they confer are not engaged, and neither is the undertaking in the California section of the Privacy Policy to give notice and an opportunity to opt out "as required by law," which by its terms reaches only California residents. Consumer rights are not being impaired by the proposed transfer: upon the Closing, the acquiror becomes the controller of the information and is subject in that capacity to every obligation these statutes impose.

Every state prohibits unfair or deceptive acts and practices, and section 5 of the Federal Trade Commission Act reaches privacy practices nationwide, in each case without any consumer-count threshold. That body of law, rather than the states' comprehensive privacy statutes, is the principal source of consumer-protection exposure in a transaction of this kind. It is also the reason the Debtor has structured the transfer to conform to its own published Privacy Policy.

Under the Bid Guidelines, no person may be designated a Qualified Bidder unless it will assume control of the Debtor's business assets and not merely its records, has stated an intended use of the customer information limited to the purposes disclosed in the Privacy Policy, has agreed to comply with the Privacy Policy as in effect on the Petition Date, and has accepted the conditions set forth above. No bid for the customer and prospect records alone may be designated a Qualified Bid; every Qualified Bid must include the Debtor's trade names, trademarks, goodwill, domain names, and websites, so that the transferee succeeds to the Debtor's business and not merely to its records. It follows that any Successful Bidder will be a transferee that assumes control of the Debtor's remaining business within the meaning of the statutory exclusions described above, and whose use of the transferred information will remain consistent with the disclosures made to

consumers at the time of collection. The proposed transfer therefore falls within those exclusions, and no consumer is entitled to an opt-out notice, whichever Qualified Bidder prevails.

If the Debtor receives a bid from a party that cannot satisfy these requirements, the Debtor will not designate that bid as a Qualified Bid without first seeking further relief from the Court on notice to the consumer privacy ombudsman.

**3. There is Good Cause for the Appointment of an Ombudsman.**

Although the Debtor submits that the proposed transfer is consistent with the Privacy Policy and that section 363(b)(1)(A) is therefore satisfied, the Debtor requests the appointment of a consumer privacy ombudsman in an abundance of caution.

A party-in-interest may contend that some aspects of the proposed transfer is not consistent with the Privacy Policy. Even though Debtor does not share that view, the customers whose information is at issue are not before the Court and cannot be expected to appear and test the question themselves, and section 332 exists to supply precisely that function. Appointment affords those customers a measure of protection that the Debtor would rather provide than withhold. The Debtor further notes that, in addition to the transfer of the Customer Information Assets to the Buyer, the estate will retain the Estate Copy and a limited license to use it in pursuing claims and causes of action of the estate.

The Debtor also requests appointment because a Successful Bid will not be identified until the bidding process concludes, and the intended use of the customer information may differ materially among the parties that have expressed interest. A bidder whose proposed use aligns with the purposes disclosed in the Privacy Policy presents a different question from one whose proposed use does not. Because the transfer is not a "sale" within the meaning of the applicable statutes, customers will not receive a statutory opt-out in connection with it, and the compressed sale timetable affords them limited practical opportunity to be heard. In those circumstances the Debtor wants the opportunity to consult with the consumer privacy ombudsman and Committee regarding any Successful Bidder whose intended use of the customer information would depart from the purposes disclosed in the Privacy Policy, before the Debtor asks the Court to approve a transfer to that bidder. That consultation is consistent with the Bid Guidelines, under which the Debtor will

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

not designate such a bid as a Qualified Bid without first seeking further relief from the Court on notice to the ombudsman.

**F. <u>The Court Should Waive the Stay Under Bankruptcy Rule 6004(h).</u>**

Pursuant to Bankruptcy Rule 6004(h), an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The purpose of this rule is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rule 6004(h). Although this rule and the Advisory Committee Note are silent as to when a court should "order otherwise," it has been suggested that the stay period should be waived to allow a transaction to close immediately when there has been no objection to procedure. 10 *Collier on Bankruptcy* 15th Ed. Rev. ¶ 6004.10 (2006). In advance of the Sale Hearing, the Debtor provided notice of the sale and of the objection and other deadlines. Accordingly, a waiver of the fourteen-day stay is appropriate under Bankruptcy Rule 6004(h).

[continues next page]

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

## IV. CONCLUSION

For the reasons set forth above, the Debtor respectfully requests that the Court grant the Motion and such other and further relief as is appropriate under the circumstances.

DATED: August 19, 2026

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP

By: /s/ Jonathan Shenson
JONATHAN SHENSON (SBN 184250)
Counsel for Debtor
Rosland Capital LLC

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

**DECLARATION OF MICHAEL HOGAN**

I, Michael Hogan, hereby declare as follows:

1. I am a Partner of Armanino Advisory LLC ("Armanino"). Rosland Capital LLC (the "Debtor") retained Armanino to provide strategic assessment and financial advice in connection with the liquidation of the Debtor's business, and, subject to Court approval, I serve as the Chief Restructuring Officer ("CRO") of the Debtor with broad authority to develop and execute a plan to liquidate the Debtor's assets.

2. I submit this declaration in support of the Debtor's Motion for an Order Approving (I) Appointment of a Consumer Privacy Ombudsman and (II) Sale of Customer Information Assets Free and Clear of Liens, Claims, and Interests, which also requests approval of the Debtor's proposed schedule for the Sale Hearing and related deadlines and the form and manner of notice (the "Motion"). Capitalized terms used but not defined herein have the meanings given to them in the Motion.

3. Unless otherwise stated, the facts set forth herein are based upon my personal knowledge, my review of the Debtor's books and records, information provided to me by the Debtor's officers, employees, professionals and advisors, or my experience of serving as a restructuring professional. If called as a witness, I could and would competently testify thereto.

**I. BACKGROUND AND QUALIFICATIONS**

4. On or about June 18, 2026, approximately two weeks before the petition date, the Debtor retained Armanino to provide strategic advisory, restructuring, liquidation, cash management, sale process, and chief restructuring officer services. Pursuant to Armanino's engagement letter, I am to serve as CRO of the Debtor with broad powers to develop and execute a plan to liquidate the Debtor's assets.

5. I lead the national Corporate Finance and Restructuring Practice at Armanino. I am a restructuring professional with more than 35 years of experience advising distressed businesses, debtors, creditors, lenders, boards of directors, receivers, and fiduciaries in insolvency matters, restructurings, liquidations, and chapter 11 proceedings.

//

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

6. Since Armanino's retention, the members of my team and I have worked extensively with the Debtor's management, legal counsel, and financial personnel to identify the Debtor's assets, assist in the wind down of the Debtor's operations, and develop and implement a process for monetizing the Debtor's remaining assets.

**II. THE CUSTOMER INFORMATION ASSETS**

7. The Debtor ceased operating prior to the petition date and is proceeding with an orderly liquidation and winddown of its affairs. The Debtor no longer possesses any inventory of precious metals, coins, or bullion, and has limited funds in its financial accounts.

8. The Debtor's principal remaining assets are the Customer Information Assets, consisting of the Debtor's right, title, and interest in and to its customer database, including customer records and contact information, transaction and purchase histories, account and order data, activity records, call logs, notes and correspondence histories, segmentation data and associated metadata, including the records of prospective customers, leads, and opportunities maintained within that database, together with the trade names, trademarks, and domain names and related digital properties identified on the schedules to the APA.

9. The Debtor's records identify approximately 35,000 customers and more than 65,000 potential customers, being people who responded to the Debtor's advertising but did not purchase products. The value of the Customer Information Assets derives from the Debtor's brand and goodwill, its established internet presence, and the customer relationships reflected in its records, none of which is publicly available.

**III. MARKETING OF THE CUSTOMER INFORMATION ASSETS**

10. Since Armanino's retention, Armanino has been marketing the Customer Information Assets and communicating with potential purchasers, including participants in the precious metals industry, other retail businesses serving comparable customers, financial services businesses, and other strategic purchasers positioned to succeed to the Debtor's business that may derive value from the Customer Information Assets.

11. In developing the list of potential purchasers, Armanino researched strategic acquirers operating within the Debtor's industry niche, as well as financial sponsors with relevant

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

investment activity and portfolio companies that could benefit from the Customer Information Assets. Armanino also leveraged its internal database to identify organizations with a demonstrated interest in investing in this sector.

12. Armanino initiated its outreach by sending an introductory email describing the Debtor and the Customer Information Assets. The email outlines the diligence process and bid submission requirements and includes a brief sale memorandum summarizing the opportunity. Interested parties may execute a non-disclosure agreement through a link provided in the email, which, upon execution, grants access to a virtual data room containing additional information regarding the Debtor's business.

13. A key component of the data room is a redacted sample of the Debtor's customer and prospect data. While the sample does not reveal the identities of any specific customers or leads, it provides potential acquirers with insight into the structure, quality, and composition of the data assets being offered for sale. Requests for additional diligence are reviewed, and access granted, on a case-by-case basis.

14. To date, three potential purchasers have expressed serious interest in acquiring the Customer Information Assets.

## IV. THE BIDDING PROCEDURES AND PROPOSED SALE

15. I have reviewed the Bid Guidelines attached to the Motion. In my business judgment, the Bid Guidelines are designed to encourage participation by all interested parties, to permit potential purchasers a fair opportunity to conduct diligence and submit competing bids, and to maximize the value realized for the Customer Information Assets.

16. The form of asset purchase agreement attached to the Motion sets the terms on which the Successful Bidder will acquire the Customer Information Assets. The sale is proposed on an "as is, where is" basis, with no representations or warranties, and the Debtor is not requesting that any liabilities be assumed by the purchaser.

17. The Debtor has not selected any purchaser, and neither I nor, to my knowledge, the Debtor has any relationship with any potential purchaser other than an arm's-length commercial one arising out of the marketing process described above. The Customer Information Assets will

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

be sold through a competitive process under the Bid Guidelines, including an auction if the Debtor elects to conduct one, to the highest or otherwise best bidder.

**V. THE PROPOSED TIMELINE**

18. In my business judgment, I believe the proposed timeline for the sale is appropriate under the circumstances. The universe of likely purchasers is known and finite, and Armanino has already identified and contacted those parties.

19. The Customer Information Assets are also not complex. They consist of discrete customer data that a potential purchaser can evaluate quickly using the materials already assembled in the data room.

20. Further, customer information of this type is, and is perceived by the market to be, a "melting ice-cube". Information becomes stale, customer purchasing histories age, and customers shift to other precious metals dealers. In my judgment, a prompt but competitive sale process preserves value that a longer timeline would erode. The Debtor also has limited funds with which to administer a prolonged sale process.

**VI. PRIVACY POLICY AND CONSUMER PRIVACY OMBUDSMAN**

21. The Customer Information Assets include personally identifiable information concerning the Debtor's customers. I have reviewed the Debtor's Privacy Policy in effect on the petition date, which is attached to the Motion.

22. The Debtor's Salesforce records reflect approximately 36,130 unique customer accounts for which a state of residence can be determined, covering orders placed between September 18, 2008 and June 11, 2026. The ten states with the largest number of accounts are California (3,891), Florida (3,389), Texas (3,142), Pennsylvania (1,559), New York (1,334), Arizona (1,306), North Carolina (1,189), Ohio (1,113), Georgia (1,088), and Michigan (1,067). No single state accounts for more than approximately eleven percent of the total.

[continues next page]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed at San Francisco, California this 19th day of August 2026.

/s/ Michael Hogan

MICHAEL HOGAN

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of August __, 2026 (the "Effective Date"), by and among (i) [INSERT] ("Buyer") and (ii) ROSLAND CAPITAL LLC, a Delaware limited liability company ("Seller"). Each of Buyer and Seller is sometimes individually called a "Party" and collectively called the "Parties."

Seller has ceased operations, and Seller wishes to transfer and Buyer wishes to acquire Seller's remaining business — comprising Seller's trade names, trademarks, and business goodwill, its internet domain names and websites, and the customer relationship records historically used in that business — as a single integrated group of Assets (as defined below), pursuant to the terms and conditions in this Agreement. For the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties agree as follows:

**1. Definitions**. The following terms have the following respective meanings (and capitalized terms not defined in this Section 1 have the meanings set forth in other sections of this Agreement):

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" for purposes of this definition means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Assets" means:

(a) all of the Seller's right, title, and interest in and to the customer database maintained by the Seller on the Salesforce customer relationship management platform (the "Customer Database"), including, as available and without limitation: (i) all customer records and all prospective customer records (each record relating to a person who has never purchased goods or services from Seller, a "Prospect Record"), including names, mailing addresses, email addresses, telephone numbers, and other contact information; (ii) all transaction and purchase histories, order data, and account records, in each case excluding any Excluded Information; (iii) all leads, opportunities, activity records, call logs, notes, and correspondence histories associated with such customers and prospective customers; (iv) all tags, segmentation data, custom fields, and associated metadata contained within the Customer Database; and (v) all electronic files, exports, reports, and copies of the foregoing, in whatever form or medium maintained. The Assets do not include (x) Seller's subscription agreement or license with Salesforce, Inc., any Salesforce software or platform rights, any hardware, (y) any Excluded Information, or (z) the Estate Copy (as defined in Section 7(a)(iv)); and

(b) all of Seller's rights, title, and interests in and to the following: (i) trade names, trademarks, service marks, logos, designs, and goodwill included on Schedule "1" and (ii) all domain names, websites, URLs, and related digital properties associated with Seller's business included on Schedule "2".

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California presiding over Seller's case under chapter 11 of the Bankruptcy Code, Case # 2:26-bk-16650-BB (the "Bankruptcy Case").

"Bankruptcy Court Approval" means the entry by the Bankruptcy Court in the Bankruptcy Case of an order (the "Approval Order"), that (a) authorizes and approves Seller's execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, (b) approves the sale, transfer and

assignment of the Assets to Buyer free and clear of all Encumbrances pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, (c) finds that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, and (d) provides that the sale, transfer, and assignment of the Assets free and clear of Encumbrances does not extinguish, release, discharge, or otherwise impair any right of any consumer arising under applicable privacy, consumer-protection, or unfair or deceptive acts and practices Law with respect to information contained in the Assets, including any right to opt out of the sale or sharing of, to request deletion or correction of, or to limit the processing of, such information, all of which rights attach to the Transferred Customer Information in the possession of Buyer from and after the Closing.

"Base Purchase Price" means $1,100,000 (inclusive of the Deposit).

"Buyer Parties" means Buyer and its subsidiaries and Affiliates and their respective officers, directors, managers, employees, representatives, agents, successors and assigns.

"Database Customer" means any Person or entity (a) whose name or contact information is included in the Assets as of the Closing Date, (b) who is a member of the same household as, or shares a mailing address, email address, or telephone number with, any person described in clause (a), or (c) any IRA, trust, or other account or entity for the benefit of or controlled by any person described in clause (a).

"Earnout Measurement Period" means each of the First Earnout Measurement Period and the Second Earnout Measurement Period, and "Earnout Measurement Periods" means both such periods collectively.

"Encumbrance" means any claim, pledge, lien, charge, security interest, lease, license, title retention, mortgage, restriction, easement, right-of-way, title defect, option, right of first offer or refusal, purchase right, adverse claim or encumbrance of any kind.

"Equitable Exceptions" means Laws governing bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws, without limitation, relating to or affecting creditors' rights generally.

"Excluded Information" means, notwithstanding anything in the definition of "Assets" to the contrary and in each case whether or not contained in the Customer Database: (a) Social Security numbers, taxpayer identification numbers, driver's license numbers, passport numbers, and other government-issued identification numbers; (b) credit card, debit card, financial account, and bank account numbers, and any access code, password, security code, or verification value associated with any of the foregoing; (c) audio or video recordings of communications with any customer or prospective customer, and any transcript of any such recording; (d) personal information of Seller's current or former employees, officers, managers, contractors, or agents; (e) any record that Seller knows or has reason to know relates to a person under the age of eighteen (18); and (f) any consumer health information, precise geolocation data, or other category of information treated as "sensitive personal information," "sensitive data," or a similar term under applicable privacy Law. Excluded Information does not constitute part of the Assets, and Seller shall have no obligation to deliver any Excluded Information to Buyer.

"First Earnout Measurement Date" means the last day of the twelfth calendar month after the Effective Date.

"First Earnout Measurement Period" means the period beginning on the Effective Date and ending on the First Earnout Measurement Date.

"Gross Revenue" means, for any applicable Earnout Measurement Period, all revenues, receipts, and other consideration of any kind actually received by the Buyer Parties (without deduction for costs of goods sold, commissions, marketing expenses, overhead, or other costs or expenses of any kind), arising from or in connection with any sale of products or services to, or any transaction with, a Database Customer, whether such transaction is consummated by telephone, internet, mail, in person, or otherwise; regardless of whether the initial contact with such Person during the Earnout Measurement Period was initiated by a Buyer Party or by the Database Customer, and regardless of whether such Database Customer was also independently known to, or a pre-existing customer

of, any Buyer Party, determined on an accrual basis; *provided*, that Gross Revenue shall be net of (i) bona fide customer refunds and returns actually paid, and (ii) sales and excise taxes collected on behalf of and remitted to a governmental authority.

"Law" means any law (statutory, common, or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation, executive order, or other similar authority enacted, adopted, promulgated, or applied by any foreign, international, federal, state, provincial, local or other governmental authority, each as amended and now in effect.

"Person" means, without limitation, any individual, partnership, joint venture, firm, corporation, limited liability company, association or other unincorporated organization, trust or other enterprise or any governmental authority.

"Proceeding" means any action, suit, litigation, arbitration, mediation, hearing, audit, investigation, claim, charge, complaint or proceeding (whether civil, criminal, administrative, Tax, investigative or informal).

"Purchase Price" means the aggregate of the Base Purchase Price and the Earnout Payments.

"Second Earnout Measurement Date" means the last day of the twenty-fourth calendar month after the Effective Date.

"Second Earnout Measurement Period" means the period beginning on the next day following the expiration of the First Earnout Measurement Period and ending on the Second Earnout Measurement Date.

"Tax" or "Taxes" means any taxes, duties, assessments, fees, withholdings, levies and other charges of any nature imposed by any governmental authority and includes all interest, penalties, fines or other additional amounts imposed by any governmental authority with respect to the foregoing.

"Transferred Customer Information" means the information relating to identified or identifiable natural persons that is contained in the Customer Database and delivered to Buyer under Section 7(a), excluding in all cases the Excluded Information.

**2. Purchase and Sale of Assets**. Buyer hereby purchases from Seller, and Seller hereby sells, transfers, conveys, assigns and delivers to Buyer, free and clear of any Encumbrances, all of Seller's rights, title and interests in, to and under the Assets, pursuant to the terms and conditions in this Agreement; provided that the transfer of the Assets free and clear of Encumbrances is not intended to, and shall not be construed to, extinguish, release, or impair any right of any consumer under applicable privacy, consumer-protection, or unfair or deceptive acts and practices Law with respect to information contained in the Assets, which rights attach to the Transferred Customer Information in Buyer's possession from and after the Closing.

**3. Deposit**. Simultaneously with the execution hereof by the Buyer, Buyer shall pay $125,000 (the "Deposit") via wire transfer to Armanino Advisory, LLC ("Armanino"), financial advisers to the Seller, as follows: [______________________________] ("Armanino Rosland Deposit Account") or to such other account which the Seller notifies the Buyer of in writing. **The Deposit shall be held in the Armanino Rosland Deposit Account pending the Closing. If the Closing occurs, the Deposit shall be credited against the Base Purchase Price. If the Closing does not occur because (a) Bankruptcy Court Approval is not obtained, (b) Seller consummates a sale of the Assets to a Person other than Buyer, or (c) Seller fails to perform its obligations under this Agreement in any material respect, the Deposit shall be returned to Buyer within five (5) business days thereafter. If the Closing does not occur because Buyer fails to perform its obligations under this Agreement in any material respect, Seller shall be entitled to retain the Deposit as liquidated damages, and**

**the Parties agree that the Deposit is a reasonable estimate of Seller's damages and constitutes Seller's sole and exclusive remedy for such failure.**

**4. Payment of Purchase Price**. At the Closing (as defined below), Buyer shall pay to Seller the Base Purchase Price, (inclusive of the Deposit), by wire transfer to the Armanino Rosland Deposit Account.

**5. Earnout.**

(a) Earnout Payments. As additional consideration for the Assets and at such times after the Closing as provided in this Section 5, Buyer must pay to Seller an aggregate amount, if any (each, an "Earnout Payment" and, collectively, the "Earnout Payments"), calculated as follows.

(i) If Gross Revenue during the First Earnout Measurement Period is equal to or greater than $[ ], Buyer shall pay to Seller an amount equal to $[ ] (the "First Earnout Milestone") to an account provided by Seller to Buyer in writing.

(ii) If Gross Revenue during the Second Earnout Measurement Period is equal to or greater than $[ ], Buyer shall pay to Seller an amount equal to $[ ] (the "Second Earnout Milestone", together with the First Earnout Milestone, each, an "Earnout Milestone") to an account provided by Seller to Buyer in writing.

(iii) For the avoidance of doubt, no Earnout Payment shall be payable with respect to any Earnout Milestone unless and until such Earnout Milestone is actually achieved in accordance with this Section 5, and no partial Earnout Payment shall be payable with respect to any Earnout Milestone.

(b) No Assurance of Earnout Payments. Except for the provisions of Sections 5(d) and (e) below, Buyer makes no representations, warranties, covenants, promises or guarantees as to (i) the amount of Gross Revenue that may be generated by Buyer following the Closing or (ii) whether the Earnout Payments may be earned by Seller. Subject to Sections 5(d) and (e), Buyer shall have sole and absolute discretion with respect to the operation of its business following the Closing and shall have no obligation to operate the business in a manner intended to achieve any Earnout Milestone or maximize any Earnout Payment.

(c) Payment of Earnout Payment; Tax Treatment. Any Earnout Payment owed to Seller pursuant to this Section 5 must be paid in full within thirty (30) days after the end of the First Earnout Measurement Period or the Second Earnout Measurement Period, as applicable. The Earnout Payment shall be accompanied by a written statement, certified by an officer of Buyer, setting forth in reasonable detail the calculation of Gross Revenue attributable to such Earnout Measurement Period, including such supporting detail as Seller may reasonably request, whether or not any Earnout Payment is then due. Seller may, within forty-five (45) days after receipt of a statement, examine Buyer's books, records, work papers and personnel relevant to the calculation (upon reasonable notice and during normal business hours) and deliver written notice of objection describing the basis for the objection in reasonable detail. The Parties shall thereafter negotiate in good faith for thirty (30) days to resolve the objection; if unresolved, the dispute may be submitted by either Seller or Buyer to the Bankruptcy Court for adjudication. All Earnout Payments shall be treated by the Parties for Tax purposes as adjustments to the Base Purchase Price unless otherwise required by applicable Law. Any Earnout Payment not paid when due shall accrue interest, from the due date until paid in full, at the lesser of ten percent (10%) per annum and the maximum rate permitted by applicable Law.

(d) Earnout Protections. Until all Earnout Payments have been paid in full or the Second Earnout Measurement Period has expired without any further Earnout Payment having become payable, Buyer shall: (i) maintain books and records sufficient to permit Gross Revenue to be determined separately for the Assets acquired from Seller, using accounting principles consistent with those used to prepare Buyer's financial statements and applied consistently across both Earnout Measurement Periods; (ii) deliver to Seller, within thirty (30) days after

the end of each calendar quarter, an unaudited statement of Gross Revenue for that quarter; (iii) preserve all books, records and work papers relevant to the determination of Gross Revenue and not destroy or dispose of them until all Earnout Payments have been finally determined and paid; (iv) not sell, transfer, license, assign or contribute the Assets or the acquired business to any Person, and not reorganize or restructure the acquired business, in any manner that would cause revenue that would otherwise constitute Gross Revenue to be excluded from Gross Revenue; and (v) not divert revenue that would otherwise constitute Gross Revenue to any Affiliate or other Person, and not accept any discount, offset, rebate, credit or non-cash consideration in lieu of such revenue, in each case for the purpose of reducing or delaying any Earnout Payment.

(e) Buyer's Earnout Indemnity. From and after the Closing and until the earlier of (i) payment in full of all Earnout Payments payable under Section 5 and (ii) the expiration of the Second Earnout Measurement Period without any further Earnout Payment having become payable, Buyer shall indemnify, defend and hold harmless Seller from and against any and all losses, liabilities, damages, costs and expenses, including reasonable attorneys' fees incurred by Seller and arising out of or resulting from: (A) any breach by Buyer of Section 5; (B) any failure by Buyer to pay any Earnout Payment when due; or (C) any act or omission of Buyer undertaken in bad faith for the primary purpose of avoiding, reducing or delaying any Earnout Payment, and Section 5(b) shall not be construed to permit any such act or omission.

**6. Closing Transactions**.

(a) The Closing; Closing Date. The closing of the transactions under this Agreement (the "Closing") will take place remotely via electronic exchange of signatures on the second (2nd) business day after Bankruptcy Court Approval has been obtained, or on such other date as the Parties may agree in writing, but in no event later than October 2, 2026 (the "Closing Date").

**7. Closing Deliveries; Further Actions.**

(a) Delivery of Customer Database. At the Closing Seller shall deliver to Buyer:

(i) Customer Database Export. A complete export of the Customer Database as maintained on Seller's instance of the Salesforce platform as of 11:59 p.m. (Pacific Time) on the date immediately preceding the Closing Date (the "Cutoff Time"), in the following form: (A) native Salesforce export files generated through Salesforce's standard data export functionality, and (B) machine-readable comma-separated value (.csv) [or Microsoft Excel] files, in each case delivered by secure electronic transmission [encrypted portable storage medium], with all field structures, record relationships, and metadata preserved to the extent supported by the export format.

(ii) Definitive Customer List. Concurrently with the delivery under Section 7(a)(i) above, Seller shall deliver to Buyer a schedule (the "Definitive Customer List") setting forth, as of the Cutoff Time, each unique person or entity included in the Customer Database, identified by name and by mailing address, email address, and telephone number to the extent contained in the Customer Database. The Definitive Customer List shall be certified in writing by the Chief Restructuring Officer as complete and accurate in all material respects and shall be initialed by both Parties at Closing and shall constitute the definitive and exclusive record of the persons and entities described in clause (a) of the definition of "Database Customer" for all purposes of this Agreement, including the calculation of Gross Revenue and Earnout Payments.

(iii) Verification; Cure. For a period of thirty (30) days following Closing, Buyer may verify the completeness and integrity of the delivered export. If Buyer identifies any material corruption, truncation, or omission in the delivered files as compared to the Customer Database as of the Cutoff Time, Seller's sole obligation shall be to re-export and redeliver the

affected records, and such redelivery shall be Buyer's sole and exclusive remedy for any defect in the form or transmission of the delivery.

(iv) Estate Copy; Post-Closing Use. Notwithstanding anything to the contrary in this Agreement (if any), Seller shall retain, and there is hereby excluded from the Assets sold, transferred, conveyed, and assigned to Buyer, one complete copy of the export of the Customer Database delivered under Section 7(a)(i), excluding in all cases the Excluded Information (the "Estate Copy"), together with a non-exclusive, perpetual, irrevocable, royalty-free license to access, use, and analyze the data contained therein for the purposes described in this Section 7(a)(iv). Seller may also retain records that must be retained to satisfy applicable Tax, anti-money laundering, or Bank Secrecy Act requirements or an order of the Bankruptcy Court. Seller may use the Estate Copy, and may retain and use one archival copy of the Definitive Customer List, solely (A) for purposes of administering this Agreement, including verifying Gross Revenue and auditing Earnout Payments, (B) as required to comply with applicable Law, regulatory inquiry, or the administration of Seller's chapter 11 case, and (C) for investigating, prosecuting, defending, settling, and otherwise administering claims and causes of action of Seller and Seller's estate, including avoidance actions under chapter 5 of the Bankruptcy Code. The rights granted to Seller under this Section 7(a)(iv), and the Estate Copy, are assignable by Seller without Buyer's consent to any official committee of unsecured creditors appointed in the Bankruptcy Case, to any trustee appointed in the Bankruptcy Case, and to any liquidating trust or other successor established under a confirmed plan in the Bankruptcy Case, in each case subject to the restrictions in this Section 7(a)(iv). Seller shall not use, and shall not permit any assignee to use, the Estate Copy or the Definitive Customer List for any commercial, marketing, or solicitation purpose, and shall maintain each subject to the same privacy and data security obligations applicable to Seller prior to Closing, to any conditions imposed by the Approval Order, and to any findings or conditions the Bankruptcy Court adopts after considering the report of a consumer privacy ombudsman appointed under Section 332 of the Bankruptcy Code.

(b) Other Deliveries of Seller. At the Closing Seller shall deliver:

(i) An executed Internet Domain Name Transfer Agreement.

(ii) A trademark assignment agreement.

(c) Deliveries of Buyer. Buyer shall pay to Seller the Base Purchase Price in accordance with Section 4.

(d) Further Actions. At any time and from time to time after the Effective Date, at Buyer's expense, Seller shall promptly execute and deliver such agreements and instruments, and take such actions, as Buyer may reasonably request in order to more effectively transfer, convey, record and assign the Assets to Buyer, confirm Buyer's title to the Assets free and clear of any Encumbrances, permit Buyer to operate the Assets and otherwise carry out the purpose and intent of this Agreement (including seeking approval of or providing notices of assignment of all business contracts in compliance with such contracts, and causing applicable Assets to be registered in the name of Buyer or an Affiliate of Buyer).

(e) Consumer Privacy. The Parties acknowledge that the Customer Database contains personally identifiable information of individual consumers. Seller shall, in connection with obtaining Bankruptcy Court Approval, disclose to the Bankruptcy Court the terms of any policy of Seller prohibiting the transfer of such information that was in effect on the date of commencement of the Bankruptcy Case, and the sale of the Assets shall be effected in compliance with Sections 332 and 363(b)(1) of the Bankruptcy Code. If a consumer privacy ombudsman is appointed under Section 332 of the Bankruptcy Code, the sale of the Assets shall be subject to such findings and conditions as the Bankruptcy Court determines to be appropriate after giving due consideration to the report of the consumer privacy ombudsman. From and after the Closing, Buyer shall use the personally

identifiable information contained in the Customer Database in compliance with (i) any conditions imposed by the Approval Order and (ii) all applicable privacy Laws.

**8. Seller Representations and Warranties**. Subject to Bankruptcy Court Approval, (i) Seller has full legal right, power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated under this Agreement and (ii) the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller.

**9. Buyer Representations and Warranties**. Buyer represents and warrants to Seller that: (a) Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of [*state*]; (b) Buyer has the unrestricted right, power and authority (and all necessary approvals) to execute and deliver, and to perform and consummate the obligations and transactions under, this Agreement; (c) this Agreement constitutes the legal, valid and binding obligations of Buyer, enforceable in accordance with its terms except as may be limited by any applicable Equitable Exceptions; (d) neither the execution and delivery of this Agreement nor the performance or consummation of any obligations or transactions under this Agreement, will (with or without notice or lapse of time or both): (i) conflict with or violate any organizational documents of Buyer or any Law applicable to Buyer, (ii) conflict with or violate any contract to which Buyer is a party or by which Buyer is bound, or (iii) result in any Encumbrance on Buyer's assets, in each case in a manner that would have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement; and (e) Buyer is not required to give any notice to, obtain any consent or license from or make any filing with any Person (including any governmental authority) in connection with this Agreement or any transactions or obligations under this Agreement, in each case the failure of which would have a material adverse effect on the ability of Buyer to perform and otherwise discharge its obligations under this Agreement; (f) Buyer is not a "covered person" and is not a "foreign person" subject to the direction, ownership, or control of any "country of concern," in each case as those terms are used in the regulations of the U.S. Department of Justice at [28 C.F.R. Part 202]; (g) Buyer will not knowingly engage in any transaction that would result in access to any Transferred Customer Information by any such person, and shall maintain reasonable measures designed to prevent such access; and (h) Buyer shall not store, host, or transfer any Transferred Customer Information outside the United States without Seller's prior written consent.

**10. Bankruptcy Related Matters**. The sale of the Assets and Seller's obligations to sell, transfer, and assign the Assets to Buyer under this Agreement are in all respects subject to and conditioned upon Bankruptcy Court Approval. Notwithstanding anything to the contrary in this Agreement, Seller shall have no obligation to consummate the Closing, and Seller shall have no liability to Buyer for failure to consummate the Closing, unless and until the Bankruptcy Court enters the Approval Order. Seller shall use commercially reasonable efforts to seek and obtain Bankruptcy Court Approval, provided that nothing herein shall require Seller to take, or refrain from taking, any action that its fiduciary duties or any order of the Bankruptcy Court would preclude.

**11. Tax Matters**. All transfer, sales and use Taxes, withholding taxes and similar charges on the transfer of the Assets will be borne by Buyer. Buyer shall cooperate with Seller, as reasonably requested by Seller, in connection with the preparation and filing of any Tax return and any Proceeding with respect to Taxes related to the Assets. Within 120 days after the Closing, Buyer shall deliver to Seller an allocation of the Base Purchase Price among the Assets, which allocation shall be subject to Seller's reasonable consent, and Seller and Buyer shall prepare any Tax forms relating to the transactions under this Agreement based on such allocation and shall not take any Tax position inconsistent with such allocation.

**12. No Assumption of Liabilities**. Buyer is purchasing the Assets only. Buyer does not assume, and shall not be deemed to have assumed, and shall have no liability or responsibility for, any liability, obligation, debt, commitment or claim of Seller or arising out of or relating to Seller's business or the Assets, whether known or unknown, asserted or unasserted, accrued or contingent, liquidated or unliquidated, due or to become due, and whether arising before, on or after the Closing. Nothing in this Section limits or otherwise impairs Buyer's obligation to pay the Base Purchase Price or any Earnout Payment. For the avoidance of doubt, this Section 12 addresses only liabilities and obligations of Seller, and nothing in this Section 12 limits, releases, or otherwise

impairs any obligation imposed on Buyer directly by applicable Law by reason of Buyer's possession or processing of the Transferred Customer Information from and after the Closing, including the obligation of a business that acquires personal information as an asset in a merger, acquisition, bankruptcy, or similar transaction to comply with requests to opt out of the sale or sharing of personal information that a consumer directed to Seller before the Closing [Cal. Civ. Code § ____, added by A.B. 1824 (2024)]. The Parties acknowledge that the foregoing obligations of Buyer are obligations of Buyer arising by operation of Law and are not liabilities of Seller assumed by Buyer.

**13. AS-IS Sale; Warranty Disclaimer**. THE ASSETS ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. BUYER ACKNOWLEDGES AND AGREES THAT UPON THE CLOSING SELLER SHALL SELL AND CONVEY ALL OF ITS RIGHT, TITLE AND INTEREST IN AND TO THE ASSETS TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS." BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT. BUYER ALSO ACKNOWLEDGES THAT THE BASE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS." BUYER ACKNOWLEDGES TO SELLER THAT BUYER HAS HAD, OR PRIOR TO THE CLOSING WILL HAVE, THE OPPORTUNITY TO CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ASSETS AND ITS ACQUISITION THEREOF, AND BUYER WARRANTS AND REPRESENTS TO SELLER THAT BUYER WILL RELY SOLELY ON ITS OWN REVIEW, INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT THERETO. BUYER ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO LATENT OR PATENT DEFECTS AND OTHER ADVERSE MATTERS, MAY HAVE NOT BEEN REVEALED BY BUYER'S REVIEW, INSPECTIONS AND INVESTIGATIONS. BUYER FURTHER ACKNOWLEDGES THAT CERTAIN OF THE ASSETS MAY INCORPORATE INTELLECTUAL PROPERTY LICENSED OR OTHERWISE ACQUIRED BY SELLER FROM THIRD PARTIES, THAT SELLER IS UNABLE TO TRANSFER INTELLECTUAL PROPERTY BELONGING TO, OWNED BY OR OTHERWISE RESTRICTED BY A THIRD PARTY WITHOUT THAT PARTY'S EXPRESS WRITTEN CONSENT, AND THAT NO SUCH CONSENT WILL BE SOUGHT OR OBTAINED BY SELLER AS PART OF THIS AGREEMENT. BUYER ACCEPTS FULL RESPONSIBILITY FOR COMMUNICATING WITH ANY THIRD PARTY WHOSE INTELLECTUAL PROPERTY MAY BE INCLUDED IN THE ASSETS TRANSFERRED HEREBY AND SHALL PAY ALL LICENSING OR OTHER FEES, COSTS, EXPENSES OR CHARGES THAT MAY BE ASSOCIATED WITH USING SUCH ASSETS.

**14. General Provisions.**

(a) Notices. All notices under this Agreement must be in writing and will be deemed properly given (i) on the next business day after deposit for overnight delivery by courier, (ii) three (3) business days after receipt by mailing, by registered or certified mail, return receipt requested, or (iii) upon transmission by email, if sent by 5:00 p.m. California time on a business day and otherwise on the next business day, in each case to the applicable address set forth below:

If to Buyer, to:

[ ]
[ ] [ ]

[ ], [ ] [ ]
Email: [ ]

with copies (which shall not constitute notice) to:

[ ]
[ ]
[ ]
[ ]
Attention:
Email:

If to the Seller, to:

Armanino Advisory, LLC
2700 Camino Ramon, Suite 350
San Ramon, CA 94583

Attention: Michael Hogan & Chris Lang
Email: michael.hogan@armanino.com
Chris.Lang@armanino.com

with copies (which shall not constitute notice) to:

Greenberg Glusker Fields Claman & Machtinger LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
Attention: Jonathan Shenson & Brian Davidoff
Email: jshenson@ggfirm.com, bdavidoff@ggfirm.com

(b) Governing Law; Jurisdiction. This Agreement and all of the transactions it contemplates, including its validity, interpretation, construction, performance, and enforcement will be governed by and construed in accordance with the laws of the State of California, without regard to conflict of law principles which would result in the application of the laws of another jurisdiction. The Bankruptcy Court has exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Agreement; provided that, if the Bankruptcy Case has been closed or dismissed or the Bankruptcy Court declines to exercise jurisdiction, the state and federal courts located in Los Angeles County, California shall have exclusive jurisdiction, and each Party consents to personal jurisdiction and venue in those courts.

(c) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs, administrators, permitted assigns, permitted transferees, permitted delegees and estates. Buyer may not assign, transfer, or delegate any of its rights, duties, or obligations hereunder without Seller's prior written consent, and any attempted assignment, transfer or delegation without such consent shall be invalid (void *ab initio*). Seller may assign, pledge, participate, sell, or otherwise transfer all or any portion of its rights, title, interests in and to the Agreement including any Earnout Payments without the consent of Buyer.

(d) Costs. Each Party is responsible for its own costs and expenses incurred in connection with this Agreement and the transactions under this Agreement; *provided*, *however*, that in any Proceeding arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party its reasonable attorneys' fees, expert fees, and other costs and expenses incurred in connection with such Proceeding, in addition to any other relief to which such Party may be entitled.

(e) Voluntary Execution. Each Party acknowledges that it has had the opportunity to be represented by separate independent counsel, including tax advisors, and that such Party understands the terms and conditions of this Agreement, including without limitation, the legal and tax consequences to such Party. The Parties represent and warrant that they have had sufficient time to consider whether to enter into this Agreement and that they are relying solely on their own judgment and the advice of their own counsel in deciding to execute this Agreement. If a Party chose not to seek its own counsel, including a tax advisor, such Party hereby acknowledges that such Party refrained from seeking counsel entirely of its own volition and with full knowledge of the consequences of such a decision. The Parties acknowledge that this Agreement and all the terms and conditions contained herein have been fully reviewed and negotiated by the Parties. Having acknowledged the foregoing, the Parties agree that any principle of construction or rule of law that provides that, in the event of any inconsistency or ambiguity, an agreement shall be construed against the drafter of this Agreement, shall have no application to the terms and conditions of this Agreement.

(f) Time of Essence. Time is of the essence and all dates, deadlines and time periods provided for under this Agreement (including Buyer's obligations under Section 5 hereof) are ABSOLUTE AND FINAL.

(g) Miscellaneous. This Agreement and any other agreement between the Parties executed on the Effective Date express the complete and final understanding of the Parties with respect to the subject matter of such agreements and supersede all prior agreements or communications among the Parties, whether written or oral, with respect to the subject matter of such agreements. No modification of this Agreement will be effective unless in writing and executed by the Parties. No waiver of any provision of this Agreement will be valid unless in writing and signed by the Party against whom the waiver is sought to be enforced. Failure of a Party to enforce any right under this Agreement will not constitute a waiver of future enforcement of such right or any other rights. If any provision of this Agreement is held to be invalid by any court, the remainder of this Agreement will remain in force and will not be affected. The language used in this Agreement has been chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. The headings in this Agreement are for reference only and will not affect the meaning of this Agreement. The word "including" means "including without limitation." When a deadline under this Agreement falls on a day that is not a business day, the deadline is deemed to fall on the next following business day. This Agreement may be executed in counterparts, all of which taken together will constitute one agreement, and signatures exchanged by facsimile or .pdf will constitute effective execution and delivery of this Agreement.

[continues on next page]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first set forth above.

**BUYER**:

[*Name*]

By: ________________________________
Name:
Title:

**SELLER**:

Rosland Capital LLC

By: ________________________________
Name: Michael Hogan
Title: Chief Restructuring Officer

# **Schedule "1"**

# Schedule "2"

# **Exhibit "A"**

# EXHIBIT B

Tel: 310.593.2200
Fax: 310.393.4230

ROSLAND CAPITAL

# Privacy Policy

**Rosland Capital – Privacy Policy**

**Original Effective Date: September 2, 2008**

**Last Modified: Effective January 1, 2023**

Welcome to the web site ("Web Site") operated by Rosland Capital LLC ("we" or "us"). We understand that you may be concerned about our collection, use, and disclosure of your information. Accordingly, we have implemented this Privacy Policy ("Policy") to describe the types of information that we collect, what we do with it, how we protect it, and when we disclose it to third parties. California residents should note that the Policy is also supplemented by and subject to the provisions set forth below under the section entitled **"Summary of Rights for California Residents Under the California Consumer Privacy Act and the California Privacy Rights Act of 2020."**

**How Do You Agree To The Policy?**

This Policy is a part of and subject to the Terms of Service ("TOS"). Accordingly, when you enter into the TOS, you agree that you have read, understand, and agree that we can collect, use, and disclose your information in accordance with this Policy. If you do not agree or are not comfortable with any part of this Policy, you should not agree to the TOS (including this Policy) and you may not use the Web Site.

**How and When is the Policy Updated? How are You Notified of these Changes?**

We may, but are not obligated to, update this Policy from time to time. Accordingly, you should periodically check the Web Site for any changes. We reserve the right to amend this Policy at our discretion and at any time. When we make changes to this Policy, we will post the updated notice on the Web Site and update the Policy's effective date. **Your continued use of our Web Site following the posting of changes constitutes your acceptance of such changes**.

**What Categories of Information Are Collected Through The Web Site or Otherwise?**

- **Personal Information.** We collect information that can be used to identify you personally ("personal information"), such as your first and last name, mailing address, billing address, telephone number, email address, communication preference, and credit card (or other payment account) information.

- **Other Information.** We also collect information that cannot be used to easily identify you, such as information about your computer hardware and software.

- **Offline Collection, Use & Disclosure of Information.** We also collect some personal information offline and we protect the privacy of that personal information as well. When someone communicates with us offline, such as by telephone, we will ask for the personal information in order to place the order, answer questions

or otherwise respond to inquiries, and to establish a customer account. Customer order information may be stored in our customer database(s). Personal information may also be obtained by us through customer wire instructions, checks or correspondence or otherwise, and we will endeavor to treat offline collection, uses, and disclosures of customer personal information in the same manner as our online policies.

- You should know that we generally use personal information collected offline in a similar manner to how we use personal information which is collected online, as outlined above.

**How Do We Collect and Use This Information?**

- **Personal Information.** We collect the personal information that you voluntarily provide to us when you use the Web Site or contact us offline. For example, if you purchase a product from the Web Site or by calling us, we will collect any information that you provide to us in any such transaction. We use your personal information primarily for our own internal purposes, such as providing, maintaining, evaluating, and improving the Web Site, evaluating and fulfilling requests for purchases, and conducting follow-up marketing efforts.

- **Other Information.** Like the operators of most web sites, we may use tracking software and similar technology, which automatically collects information about your computer hardware and software, and use of the Web Site. This information may be used by us for the operation of the Web Site and to provide general statistics regarding use of the Web Site. Many commercial web site operators collect this information in similar ways.

- **Cookies.** Cookies are bits of electronic information that a web site can transfer to a visitor's hard drive to help tailor and keep records of his or her visit. Cookies allow web site operators to better customize visits to the site to the visitor's individual preferences. Many commercial web sites use cookies. Although most web browsers automatically accept cookies, you can usually change your browser to prevent or notify you whenever you are sent a cookie. This gives you the chance to decide whether or not to accept it. However, if you set your browser such that it does not accept cookies, you may not be able to access certain of the features on the Web Site.

- **Tracking Pixels or Beacons.** Aside from cookies, we also collect information regarding the delivery of an advertisement to a user's device through the use of "tracking pixels" or "beacons." A tracking pixel is a transparent graphic image, typically 1 pixel x 1 pixel, that is placed on a web page and, in combination with a cookie, enables the collection of information regarding the use of the web page that has the tracking pixel. We use tracking pixels to tell when an ad has been clicked on or otherwise interacted with, and use that information to determine which ads are more appealing to users. In some cases, we use third party service providers to help us collect and analyze this information.

- **Do Not Track Signals.** We do not respond to "do not track" signals from web browsers or other mechanisms that provide consumers the ability to exercise choice regarding the collection of personally identifiable information about an individual consumer's online activities over time and across third-party Web sites or online services.

**How Do We Keep Your Personal Information Secure?**

We protect your personal information using appropriate security measures to protect against unauthorized access and/or disclosure. These measures include physical security designed to prevent unauthorized access to servers where personal data is stored, and ongoing internal reviews of our data collection, storage, and sharing practices as appropriate. In addition, we only maintain your credit card (or other payment account) information for as long as is necessary for us to process your payment.

- Access to your personal information is restricted to our employees, contractors and agents who need to access such information to provide our services.

- We make use of your personal information only for the purposes for which it was collected and in accordance with this Policy.

**When Will We Disclose Your Personal Information Without Your Consent?**

Generally speaking, we will not disclose your personal information to third parties who are not our affiliates without your consent. (We may, however, share your personal information with our affiliates who may use it for marketing purposes.) We do not sell or exchange customer lists or customer information for marketing purposes with unaffiliated third parties. However, we reserve the right to disclose your personal information without your consent for any of the following reasons:

- **Disclosure to Successors.** We may disclose your personal information to any actual or potential successor-in-interest of ours, such as a company that is seeking to acquire us.

- **Third-Party Service Providers.** We may disclose your personal information to third party service providers who help us provide or maintain the Web Site. We require by contract that these third-party service providers implement and maintain reasonable practices to protect your personal information. We also may disclose your personal information to our suppliers to enable them to ship our products to you.

- **Other Disclosure.** We will disclose your personal information without your consent to prevent an emergency, to protect or enforce our rights, to protect against suspected credit card fraud, to protect or enforce the rights of a third party, or as required or permitted by law (including, without limitation, to comply with a subpoena or court order).

**Can You Review and Change Your Personal Information?**

Please send us an email (at the email address listed below) if you would like to review or change your personal information. Once we have reasonable assurances that it is you, we will let you review or change your personal information.

**How Do We Protect Your Personal Information?**

Whenever we obtain your personal information, we will implement and maintain reasonable practices to protect your personal information from unauthorized access or disclosure. While we will use such efforts, we cannot and will not act as insurers of the security of your personal information. Accordingly, we assume no liability for any

disclosure of data due to errors in transmission, unauthorized third-party access or other acts of third parties, or acts or omissions beyond our reasonable control.

**What About Children's Personal Information?**

We are not targeting the Web Site to children, and we do not knowingly collect personal information from children under the age of 18. If you are under the age of 18, please do not email us, contact us, attempt to access or use the Web Site, submit information, including personal information, to the Web Site, or ask us to email you. As a result of the foregoing age restrictions, no information obtained by the Web Site falls within the scope of the Children's Online Privacy Protection Act of 1998, and information submitted to the Web Site is not monitored for such purposes.

**What Can You Tell Us About California Privacy Rights?**

Section 1798.83 of the California Civil Code enables our customers who are California residents to request certain information from us with respect to our disclosure information to third parties for their direct marketing purposes. **California residents can make such a request by sending an email to us at: compliance@roslandcapital.com or by writing to us at: Rosland Capital LLC, 11766 Wilshire Boulevard Suite 1200 Los Angeles, CA 90025 or by calling us at the following toll-free number: 1-800-967-5151.** Please also see the information set forth below under the caption **"Summary of Rights for California Residents Under the California Consumer Privacy Act and the California Privacy Rights Act of 2020."**

**Who Do You Contact If You Have Any Questions About Privacy?**

If you have any questions regarding privacy, you should contact us through the following email address: **compliance@roslandcapital.com**.

**Summary of Rights for California Residents Under the California Consumer Privacy Act and the California Privacy Rights Act of 2020**

If you are a California resident, this section applies to you. This section describes how we collect, use, and share your personal information (including sensitive personal information) in operating our business, and the rights that you have with respect to your personal information (including sensitive personal information). More information regarding the sources from which we collect personal information can be found as indicated above in "**What Categories of Information Are Collected Through The Web Site or Otherwise?"**; business and commercial purposes for which we collect your personal information can be found as indicated above in "**How Do We Collect and Use This Information?"**; and categories of recipients with whom personal information is shared can be found as indicated above in "**When Will We Disclose Your Personal Information Without Your Consent?"**

**California Civil Code ("CCP") § 1798.100.** As a consumer, you have the right to be informed of and we must disclose to you the categories and specific pieces of personal information (including sensitive personal information) collected by us, which is sometimes referred to as a data portability request. At or before the point of collection, we must disclose to you the categories of information to be collected and the purposes for which the information will be used, and whether such information is sold or shared. Rosland does not sell or share your personal information and will not do so in the future without providing you with notice and an opportunity to opt-out of such sale or sharing as required by law. "Sharing" for these purposes means sharing a customer's personal

information to a third party—that is, not a service provider or contractor to us--for cross-context behavioral advertising, defined as “the targeting of advertising to a consumer based on the consumer's personal information obtained from the consumer's activity across businesses, distinctly-branded websites, applications, or services, other than the business, distinctly-branded website, application, or service with which the consumer intentionally interacts.”

This information must be disclosed to you free of charge, by mail or electronically. Information disclosed electronically must be in a portable format, and to the extent technically feasible, in a readily useable format that allows you to transmit the information without hindrance to another entity.

“Personal information” is defined in CCP § 1798.140 to include information that identifies, relates to, describes, references, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or device. Personal information does not include:

- Publicly available information from government records.
- Deidentified or aggregated consumer information.
- Information excluded from the California Consumer Privacy Act's scope, like:
- health or medical information covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the California Confidentiality of Medical Information Act (CMIA) or clinical trial data;
- personal information covered by certain sector-specific privacy laws, including the Fair Credit Reporting Act (FRCA), the Gramm-Leach-Bliley Act (GLBA) or California Financial Information Privacy Act (FIPA), and the Driver's Privacy Protection Act of 1994.

‘Sensitive personal information” is defined in CCP § 1798.140 to mean:

(1) Personal information that reveals:

- A consumer’s social security, driver’s license, state identification card, or passport number.
- A consumer’s account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account.
- A consumer’s precise geolocation.
- A consumer’s racial or ethnic origin, religious or philosophical beliefs, or union membership.
- The contents of a consumer’s mail, email, and text messages unless the business is the intended recipient of the communication.
- A consumer’s genetic data.

(2)

- The processing of biometric information for the purpose of uniquely identifying a consumer.
- Personal information collected and analyzed concerning a consumer's health.
- Personal information collected and analyzed concerning a consumer's sex life or sexual orientation.

(3) Sensitive personal information that is "publicly available" pursuant to the statute is not considered sensitive personal information or personal information.

We are also required to disclose the length of time we intend to retain each category of personal information, including sensitive personal information, or if that is not possible, the criteria used to determine that period provided that we shall not retain a consumer's personal information or sensitive personal information for each disclosed purpose for which the personal information was collected for longer than is reasonably necessary for that disclosed purpose.

**CCP § 1798.105.** As a consumer, you have the right to request that we delete the personal information collected from you. We are required to inform you of this right. We are not required to comply with a request to delete personal information if it is necessary for us or one of our service providers to maintain the information in order to accomplish one of the following:

- Complete the transaction for which we collected the personal information, provide a good or service that you requested, take actions reasonably anticipated within the context of our ongoing business relationship with you, or otherwise perform our contract with you.
- Detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity, or prosecute those responsible for such activities.
- Debug products to identify and repair errors that impair existing intended functionality.
- Exercise free speech, ensure the right of another consumer to exercise their free speech rights, or exercise another right provided for by law.
- Comply with the California Electronic Communications Privacy Act (Cal. Penal Code § 1546 seq.).
- Engage in public or peer-reviewed scientific, historical, or statistical research in the public interest that adheres to all other applicable ethics and privacy laws, when the information's deletion may likely render impossible or seriously impair the research's achievement, if you previously provided informed consent.
- Enable solely internal uses that are reasonably aligned with consumer expectations based on your relationship with us.
- Comply with a legal obligation.

CCP § 1798.106. You have the right to request that we correct inaccurate personal information about you and to request to limit disclosure or use of your sensitive personal information. We will use commercially reasonable efforts after receipt of a verifiable consumer request to make requested applicable corrections.

**CCP § 1798.110.** You have the right to request that we disclose the following to you:

- The categories of personal information we have collected about you.
- The categories of sources from which the personal information is collected.
- The business or commercial purpose for collecting or selling personal information.
- The categories of third parties with whom we share personal information.
- The specific pieces of personal information we have collected about you.

**CCP § 1798.115.** You have the right to request that we disclose the following to you:

- The categories of personal information that we collected about you.
- If we sold or shared information about you—which we did not--the categories of personal information that we sold or shared about you and the categories of third parties to whom the information was sold or shared. If applicable, this information would be described by category of information for each third party to whom the information was sold.
- The categories of personal information that we disclosed about you for a business purpose.

**CCP § 1798.120.** We do not and will not sell or share your personal information. If we did so, you would have the right to direct us not to sell or share your personal information and we would be required to give you notice of this right and to inform you that you could exercise this right by visiting a specific link on our Web Site that would be titled *"Do Not Sell or Share My Personal Information"*.

**CCP § 1798.125.** We are prohibited from discriminating against you for exercising your rights under the California Consumer Privacy Act; this includes, but is not limited to, discrimination by:

- Denying you goods or services.
- Charging different prices or rates for goods or services, including through the use of discounts or other benefits or imposing penalties.
- Providing a different level or quality of goods or services to you.
- Suggesting that you will receive a different price or rate for goods or services or a different level or quality of goods or services.
- Retaliating against an employee, applicant for employment, or independent contractor, for exercising their rights under this title.

However, we are allowed to offer financial incentives, including payments to consumers, for the collection, sale, or deletion of personal information. We are required to give you notice of any financial incentives offered and may only enter you into a financial incentive program if you provide consent by opting-in after being informed of the material terms of the program. You may revoke your consent at any time.

**Categories of Personal Information Collected in Past 12 Months**

We have collected the following categories of personal information from our customers within the last twelve (12) months:

| **Category** | **Examples** | **Collected** |
|---|---|---|
| A. Identifiers. | A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number, driver's license number, passport number, or other similar identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | A name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information.<br>Some personal information included in this category may overlap with other categories. | YES |

| | | |
|---|---|---|
| C. Protected classification characteristics under California or federal law. | Age (40 years or older), race, color, ancestry, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, veteran or military status, genetic information (including familial genetic information). | NO |
| D. Commercial information. | Records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies. | NO |
| E. Biometric information. | Genetic, physiological, behavioral, and biological characteristics, or activity patterns used to extract a template or other identifier or identifying information, such as, fingerprints, faceprints, and voiceprints, iris or retina scans, keystroke, gait, or other physical patterns, and sleep, health, or exercise data. | NO |
| F. Internet or other similar network activity. | Browsing history, search history, information on a consumer's interaction with a website, application, or advertisement. | YES, AS TO VISITORS TO OUR SITE |
| G. Geolocation data. | Physical location or movements. | NO, NOT USED, BUT POTENTIALLY ACCESSIBLE VIA IP ADDRESSES |

| | | |
|---|---|---|
| H. Sensory data. | Audio, electronic, visual, thermal, olfactory, or similar information. | YES, AS TO AUDIO RECORDINGS |
| I. Professional or employment-related information. | Current or past job history or performance evaluations. | NO, AS TO CUSTOMERS.<br><br>YES, AS TO EMPLOYEES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | Education records directly related to a student maintained by an educational institution or party acting on its behalf, such as grades, transcripts, class lists, student schedules, student identification codes, student financial information, or student disciplinary records. | NO |
| K. Inferences drawn from other personal information. | Profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes. | NO |

We obtain the categories of personal information listed above from the following categories of sources:

- Directly from you. For example, from forms you complete or products you purchase.
- Your actions on our Web Site, landing pages, and other web properties.

We retain the information we receive about you for a period of 24 months, unless a shorter or longer period is required by California or Federal law.

**Use of Personal Information**

We may use, or disclose the personal information we collect for one or more of the following business purposes:

- As indicated above in "**How Do We Collect and Use This Information?**"
- To fulfill or meet the reason you provided the information. For example, if you share your name and contact information to request a price quote or ask a question about our products, we will use that personal information to respond to your inquiry. If you provide your personal information to purchase

a product, we will use that information to process your payment and facilitate delivery. We may also save your information to facilitate new product orders or process returns.

- To provide, support, personalize, and develop our Web Site and products.
- To create, maintain, customize, and secure your account with us.
- To process your requests, purchases, transactions, and payments and prevent transactional fraud.
- To provide you with support and to respond to your inquiries, including to investigate and address your concerns and monitor and improve our responses.
- To help maintain the safety, security, and integrity of our Web Site, products, databases and other technology assets, and business.
- To respond to law enforcement requests and as required by applicable law, court order, or governmental regulations.
- As described to you when collecting your personal information or as otherwise set forth in the California Consumer Privacy Act.
- To evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of our assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal information held by us about our customers or Web Site users is among the assets transferred.

We will not collect additional categories of personal information or use the personal information we collected for different, unrelated, or incompatible purposes without providing you notice.

**Disclosing Personal Information**

We may disclose your personal information to a third party for a business purpose. When we disclose personal information for a business purpose, we enter a contract that describes the purpose and requires the recipient to keep that personal information confidential, not sell it or share it, use it for any purpose except performing the contract or combine it with other personal information it has obtained.

We may disclose your personal information with the following category of third parties:

- Our suppliers in order to enable them to ship our products to you.

***Disclosures of Personal Information for a Business Purpose***

In the preceding 12 months, we disclosed the following categories of personal information for a business purpose:

Category A: Identifiers.

Category B: California Customer Records personal information categories.

We disclose your personal information for a business purpose to the following categories of third parties:

- Our suppliers in order to enable them to ship our products to you.

**Sales or Sharing of Personal Information**

In the preceding 12 months, we have not sold or shared personal information and we will not sell or share your personal information without providing you with notice and an opportunity to opt-out of such sale or sharing as required by law.

**Exercising Access, Data Portability, and Deletion Rights**

To exercise the access, data portability, deletion and correction rights described above, please submit a verifiable consumer request to us by any one of the following:

- Toll-free Telephone: 1-800-967-5151.
- Website: https://www.roslandcapital.com/contact.
- Mail: Rosland Capital LLC, 11766 Wilshire Boulevard Suite 1200, Los Angeles, CA 90025
- Email: **compliance@roslandcapital.com**.

In addition, a consumer with a disability may access the Policy in an alternative format by submitting a request to us as indicated above.

Only you, or a person you designate as an authorized agent to act on your behalf, may make a verifiable consumer request related to your personal information. You may also make a verifiable consumer request on behalf of your minor child. We reserve the right to require verification of your authorized agent's identity and authority.

You may only make a verifiable consumer request for access or data portability twice within a 12-month period. The verifiable consumer request must:

- Provide sufficient information that allows us to reasonably verify you are the person about whom we collected personal information or an authorized representative.
- Describe your request with sufficient detail that allows us to properly understand, evaluate, and respond to it.

We cannot respond to your request or provide you with personal information if we cannot verify your identity or authority to make the request and confirm the personal information relates to you.

Making a verifiable consumer request does not require you to create an account with us. However, we do consider requests made through your password protected account sufficiently verified when the request relates to personal information associated with that specific account.

We will only use personal information provided in a verifiable consumer request to verify the requestor's identity or authority to make the request.

We endeavor to respond to a verifiable consumer request within 45 days of its receipt. If we require more time (up to 90 days), we will inform you of the reason and extension period in writing.

If you have an account with us, we will deliver our written response to that account. If you do not have an account with us, we will deliver our written response by mail or electronically, at your option.

Any disclosures we provide will only cover the 12-month period preceding the verifiable consumer request's receipt, though in some circumstances the requestor may request the required information beyond a 12-month period. The response we provide will also explain the reasons we cannot comply with a request, if applicable.

For data portability requests, we will select a format to provide your personal information that is readily useable and should allow you to transmit the information from one entity to another entity without hindrance. We do not charge a fee to process or respond to your verifiable consumer request unless it is excessive, repetitive, or manifestly unfounded. If we determine that the request warrants a reasonable fee, we will tell you why we made that decision and provide you with a cost estimate before completing your request.

# EXHIBIT C

# Rosland Capital - Terms of Service

**Effective Date: September 2, 2008**
**Last Modified: March 4, 2014**

This Terms of Service ("TOS") is a legally binding agreement made by and between Rosland Capital LLC ("we" or "us") and you, personally and, if applicable, on behalf of the entity for whom you are using this web site (collectively, "you"). This TOS governs your use of the roslandcapital.com web site ("Web Site") and the services we offer on the Web Site ("Services"), so please read it carefully.

**BY ACCESSING OR USING ANY PART OF THE WEB SITE, YOU AGREE THAT YOU HAVE READ, UNDERSTAND AND AGREE TO BE BOUND BY THIS TOS. IF YOU DO NOT AGREE TO BE SO BOUND, DO NOT ACCESS OR USE THE WEB SITE.**

**INTERNET TECHNOLOGY AND THE APPLICABLE LAWS, RULES, AND REGULATIONS CHANGE FREQUENTLY. ACCORDINGLY, WE RESERVE THE RIGHT TO MAKE CHANGES TO THIS TOS AT ANY TIME. YOUR CONTINUED USE OF THE WEB SITE CONSTITUTES ASSENT TO ANY NEW OR MODIFIED PROVISION OF THIS TOS THAT MAY BE POSTED ON THE WEB SITE.**

**1. Using The Web Site.**

(a) Eligibility. The Web Site may only be used by individuals and entities who can form legally binding contracts under applicable law. No person under the age of 18 may use the Web Site. Your use of the Web Site will be deemed to be a representation that you are 18 years of age or older. We require that all purchases be made by individuals 18 years of age or older.

(b) License and Restrictions. Subject to the terms and conditions of this TOS, you are hereby granted a limited, non-exclusive right to use the content and materials on our Web Site in the normal course of your use of the Web Site. We will retain ownership of our intellectual property rights and you will not obtain any rights therein by virtue of this TOS or otherwise, except as expressly set forth in this TOS. You will have no right to use, copy, display, perform, create derivative works from, distribute, transmit or sublicense materials or content available on the Web Site, except as expressly set forth in this TOS.

(c) Prohibited Conduct. In your use of the Web Site, you may not: (i) infringe any patent, trademark, trade secret, copyright, right of publicity or other right of any party; (ii) disrupt or interfere with the security or use of the Web Site or any web sites linked to the Web Site; (iii) interfere with or damage the Web Site, including, without limitation, through the use of viruses, cancel bots, Trojan horses, harmful code, flood pings, denial of service attacks, packet or IP

spoofing, forged routing or electronic mail address information, or similar methods or technology; (iv) impersonate another person or entity, misrepresent your affiliation with a person or entity, including (without limitation) us, or use a false identity; (v) attempt to obtain unauthorized access to the Web Site; (vi) engage, directly or indirectly, in transmission of "spam," chain letters, junk mail or any other type of unsolicited solicitation; (vii) collect, manually or through an automatic process, information about other users or the Web Site without their or our express written consent; (viii) submit false or misleading information to us; (ix) violate any law, rule, or regulation; (x) engage in any activity that interferes with any third party's ability to use or enjoy the Web Site; or (xi) assist or encourage any third party in engaging in any activity prohibited by this TOS.

**2. Password and Account Security.**

(a) Registration. You may create your own account on the Web Site by completing the online registration process on the Web Site, and must do so if you would like to make a purchase. In doing so, you must provide us with accurate and complete registration information, and update it if this information changes. It is particularly important to keep the e-mail address associated with your account current because although you may be able to log into your Web Site account using an old e-mail address, you will not be able to receive messages from us about your orders or other matters.

(b) Accounts and Passwords. Following registration, we will create an account for you and assign you, or allow you to select, a password. You must keep your password confidential. You will be responsible for all use of your password, including, without limitation, any use by any unauthorized third party. You must notify us immediately if you believe your password may be used by any unauthorized person or entity. For security purposes, we recommend you change your password often. Under no circumstance should you respond to a request for your password. Our employees will never ask for your password. You must notify us immediately if you receive such a request. We reserve the right to suspend or terminate your use of the Web Site if we believe that your password is being used without permission or otherwise in a manner that may disrupt the Web Site.

**3. Privacy Policy.** You agree to the terms of our **Privacy Policy**, which is incorporated by reference into this TOS.

**4. Accuracy of Information.** We attempt to ensure that the information on the Web Site is complete and accurate; however, this information may contain typographical errors, pricing errors, and other errors or inaccuracies. We assume no responsibility for such errors and omissions, and reserve the right to: (i) revoke any offer stated on the Web Site; (ii) correct any errors, inaccuracies or omissions; and (iii) make changes to prices, content, promotions, product descriptions or specifications, or other information on the Web Site.

**5. Sales Tax.** If you purchase any products available on the Web Site ("Products"), you will be responsible for paying any sales tax indicated on the Web Site.

**6. Customer Agreement.** If you purchase any Products available on the Web Site, you will be required to enter into a **Customer Agreement**, which is incorporated by reference into this TOS.

**7. Security.** We employ measures designed to ensure the security of the Web Site, but, as provided below, make no guarantees in this regard.

**8. Intellectual Property Rights.**

(a) Copyright. All materials on the Web Site, including without limitation, the logos, design, text, graphics, other files, and the selection and arrangement thereof are either owned by us or are the property of our suppliers or licensors. You may not use such materials without permission. © 2014 Rosland Capital LLC ALL RIGHTS RESERVED.

(b) Trademarks. Rosland Capital is a trade name we own. Rosland Capital, the related design marks, and other trademarks on the Web Site are owned by us. Page headers, custom graphics, button icons and scripts are trademarks or trade dress we own. You may not use any of these trademarks, trade dress, or trade names without our express written permission.

**9. Third-Party Services.** We may use third parties to provide certain services accessible through the Web Site and may provide links to third party web sites. We do not control those third parties, their services, or their web sites. We will not be liable to you in any way for your use of such services or web sites. These third parties may have their own terms of use and other policies. You must comply with such terms and policies as well as these TOS when you use these services and web sites.

**10. Linking and Framing.** You may not deep link to portions of the Web Site, or frame, inline link, or similarly display any of our property, including, without limitation, the Web Site. You may not use any of our logos or other trademarks as part of a link without express written permission.

**11. Comments.** All comments, feedback, suggestions, ideas, and other submissions that you disclose, submit or offer to us in connection with your use of the Web Site (collectively, "Comments") will become our exclusive property. Such disclosure, submission or offer of any Comments shall constitute an assignment to us of all worldwide right, title and interest in all patent, copyright, trademark, and all other intellectual property and other rights whatsoever in and to the Comments and a waiver of any claim based on moral rights, unfair competition, breach of implied contract, breach of confidentiality, and any other legal theory. You will, at our cost, execute any documents to effect, record, or perfect such assignment. Thus, we will own exclusively all such right, title and interest and shall not be limited in any way in the use, commercial or otherwise, of any Comments. You should not submit any Comments to us if you

do not wish to assign such rights to us. We are and will be under no obligation: (i) to maintain any Comments in confidence; (ii) to pay to you or any third party any compensation for any Comments; or (iii) to respond to any Comments. You are and shall remain solely responsible for the content of any Comments you make.

**12. Indemnification.** You agree to indemnify, defend and hold us and our employees, representatives, agents, attorneys, affiliates, directors, officers, managers and members (the "Indemnified Parties") harmless from any damage, loss, cost or expense (including, without limitation, attorneys' fees and costs) incurred in connection with any third-party claim, demand or action ("Claim") brought or asserted against any of the Indemnified Parties arising from, related to, or connected with your use of the Web Site. If you are obligated to provide indemnification pursuant to this provision, we may, in our sole and absolute discretion, control the disposition of any Claim at your sole cost and expense. Without limitation of the foregoing, you may not settle, compromise or in any other manner dispose of any Claim without our consent.

**13. DISCLAIMERS, EXCLUSIONS AND LIMITATIONS.**

(a) DISCLAIMER OF WARRANTIES. WE PROVIDE THE WEB SITE ON AN "AS IS" AND "AS AVAILABLE" BASIS. WE DO NOT REPRESENT OR WARRANT THAT THE WEB SITE, ITS USE OR ANY INFORMATION ON IT: (I) WILL BE UNINTERRUPTED OR SECURE; (II) WILL BE FREE OF DEFECTS, INACCURACIES OR ERRORS; (III) WILL MEET YOUR REQUIREMENTS; OR (IV) WILL OPERATE IN THE CONFIGURATION OR WITH OTHER HARDWARE OR SOFTWARE YOU USE. WE MAKE NO WARRANTIES OTHER THAN THOSE MADE EXPRESSLY IN THIS TOS, AND HEREBY DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND NON-INFRINGEMENT.

(b) DISCLAIMER OF FORWARD-LOOKING STATEMENTS. THIS WEB SITE MAY CONTAIN FORWARD-LOOKING STATEMENTS THAT REFLECT OUR CURRENT EXPECTATION REGARDING FUTURE EVENTS AND BUSINESS DEVELOPMENTS. THE FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES. ACTUAL DEVELOPMENTS OR RESULTS COULD DIFFER MATERIALLY FROM THOSE PROJECTED AND DEPEND ON A NUMBER OF FACTORS, SOME OF WHICH ARE OUTSIDE OUR CONTROL.

(c) EXCLUSION OF DAMAGES. WE WILL NOT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOST PROFITS, LOST DATA OR LOSS OF GOODWILL) ARISING OUT OF, RELATING TO OR CONNECTED WITH THE USE OF THE WEB SITE OR PRODUCTS,

REGARDLESS OF THE CAUSE OF ACTION ON WHICH THEY ARE BASED, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING.

(d) LIMITATION OF LIABILITY. IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING FROM, RELATING TO, OR IN CONNECTION WITH THIS TOS (INCLUDING, WITHOUT LIMITATION, CLAIMS RELATING TO THE WEB SITE OR THE PRODUCTS) EXCEED THE AMOUNT YOU PAID FOR THE PRODUCTS, LESS THE FAIR MARKET VALUE OF SUCH PRODUCTS.

**14. Domestic Use.** We control the Web Site from our offices within the United States of America. We make no representation that the Web Site or its content is appropriate or available for use in other locations. Users who access the Web Site from outside the United States of America do so on their own initiative and must bear all responsibility for compliance with local laws, if applicable. No content from the Web Site may be downloaded in violation of United States law.

**15. Force Majeure.** We will not be liable for failing to perform under this TOS because of any event beyond our reasonable control, including, without limitation, a labor disturbance, an Internet outage or interruption of service, a communications outage, failure by a service provider to perform, fire, terrorism, natural disaster or war.

**16. Arbitration.** All disputes arising out of or relating to this TOS (including its formation, performance or alleged breach) or your use of the Web Site will be exclusively resolved under confidential binding arbitration held in Santa Monica, California. The arbitrator's award will be binding and may be entered as a judgment in any court of competent jurisdiction. To the fullest extent permitted by applicable law, no arbitration under this TOS will be joined to an arbitration involving any other party subject to this TOS, whether through class arbitration proceedings or otherwise. Notwithstanding the foregoing, we will have the right to seek injunctive or other equitable relief in state or federal court located in Los Angeles, California to enforce this TOS or prevent an infringement of a third party's rights. In the event equitable relief is sought, each party hereby irrevocably submits to the personal jurisdiction of such court. Each party agrees that it will share equally in the basic arbitration costs, including administration fees and the fees of the arbitrator(s). Each party shall be responsible for its own attorneys' fees.

**17. WAIVER OF CLASS ACTION RIGHTS.** BY ENTERING INTO THIS TOS, YOU HEREBY IRREVOCABLY WAIVE ANY RIGHT YOU MAY HAVE TO JOIN CLAIMS WITH THOSE OF OTHERS IN THE FORM OF A CLASS ACTION OR SIMILAR PROCEDURAL DEVICE. ANY CLAIMS ARISING OUT OF, RELATING TO, OR CONNECTED WITH THIS TOS MUST BE ASSERTED INDIVIDUALLY.

**18. Limitation of Actions.** You acknowledge and agree that, regardless of any statute or law to the contrary, any claim or cause of action you may have arising out of, relating to, or connected

with your use of the Web Site, must be filed within one calendar year after such claim or cause of action arises, or forever be barred.

**19. No Legal or Tax Advice.** No statements in the Web Site are intended to or constitute legal advice, including tax or financial advice or recommendations. You should seek the advice of your own legal, tax and financial advisors regarding the consequences to you of purchasing or selling precious metals. The information in this Web Site does not constitute any investment advice or investment service, and is not intended as an offer or solicitation to purchase any security or financial instrument.

**20. Changes to the Web Site.** We may, in our sole discretion, change, modify, suspend, make improvements to or discontinue any aspect of the Web Site, temporarily or permanently, at any time without notice to you, and we will not be liable for doing so.

**21. Accuracy of Information.** Over time, information in the Web Site may become stale, so you should not rely on the continuing accuracy of such information. We have no obligation to update any such information.

**22. Termination.** We will have the right to terminate your access to the Web Site if we reasonably believe you have breached any of the terms and conditions of this TOS. Following termination, you will not be permitted to use the Web Site and we may, in our discretion, cancel any outstanding product orders. If your access to the Web Site is terminated, we reserve the right to exercise whatever means we deem necessary to prevent unauthorized access to the Web Site, including, but not limited to, technological barriers, IP mapping, and direct contact with your Internet Service Provider. This TOS will survive indefinitely unless and until we choose to terminate it, regardless of whether any account you open is terminated by you or us or if you have the right to access or use the Web Site.

**23. Integration.** This TOS contains the entire understanding between you and us regarding the use of the Web Site, and supersedes all prior and contemporaneous agreements and understandings between you and us relating thereto.

**24. Additional Terms.** This TOS will be binding upon each party hereto and its successors and permitted assigns, and governed by and construed in accordance with the laws of the State of California without regard for conflict of law principles. This TOS and all of your rights and obligations under them may not be assignable or transferable by you without our prior written consent. No failure or delay by a party in exercising any right, power or privilege under this TOS will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege under this TOS. You are an independent contractor, and no agency, partnership, joint venture, employee-employer relationship is intended or created by this TOS. The invalidity or unenforceability of any provision of this TOS will not affect the validity or enforceability of any other provision of this TOS, all of which will remain in full force and effect.

# EXHIBIT D

# BID GUIDELINES FOR THE SALE OF THE DEBTOR'S ASSETS

The Bid Guidelines set forth the process by which Rosland Capital LLC (the "Debtor") is proceeding with the sale (the "Sale") of the Customer Information Assets, as defined herein, and the requirements a party must satisfy to become a Qualified Bidder.

## 1. Submissions to the Debtor.

All submissions to the Debtor required to be made under these Bid Guidelines must be directed to each of the following persons unless otherwise provided (collectively, the "Notice Parties"):

**A.** *Debtor*. Michael Hogan, Chief Restructuring Officer, Armanino Advisory LLC, 2700 Camino Ramon, Suite 350, San Ramon, CA 94583, Attn: Michael Hogan (michael.hogan@armanino.com) and Chris Lang (Chris.Lang@armanino.com).

**B.** *Debtor's Counsel***.** Greenberg Glusker LLP, 2049 Century Park East, Suite 2600, Los Angeles, CA 90067, Attn: Brian L. Davidoff (bdavidoff@ggfirm.com), Jonathan Shenson (jshenson@ggfirm.com).

**C.** To the official committee of unsecured creditors appointed in this case (the "Committee"), c/o its proposed counsel, Ice Miller LLP, 500 Delaware Avenue, Wilmington, DE 19801, Attn: Christopher Samis (Christopher.Samis@icemiller.com), Aaron Stulman (Aaron.Stulman@icemiller.com) and Sarah Gladieux (Sarah.Gladieux@icemiller.com).

## 2. Assets Subject to Sale Pursuant to Asset Purchase Agreement ("APA").

The assets being sold consist of all of the Seller's right, title, and interest in and to all of the Debtor's intellectual property assets including, but not limited, to customer and potential customer information (the "Customer Information"). The primary Customer Information is the customer database maintained by the Debtor on the Salesforce customer relationship management platform (the "Customer Database"), including, as available and without limitation: (i) all customer and prospective customer records, including names, mailing addresses, email addresses, telephone numbers, and other contact information; (ii) all transaction and purchase histories, account records, and order data; (iii) all leads, opportunities, activity records, call logs, notes, and correspondence histories associated with such customers and prospective customers; (iv) all tags, segmentation data, custom fields, and associated metadata contained within the Customer Database; and (v) all electronic files, exports, reports, and copies of the foregoing, in whatever form or medium maintained. In addition, there is all of Seller's rights, title, and interests in and to the following (collectively with the Customer Information, the "Customer Information Assets"): (i) trade names, trademarks, service marks, logos, designs, and goodwill and (ii) all domain names, websites, URLs, and related digital properties associated with Seller's business. The Customer Information Assets do not include the Debtor's subscription agreement or license with Salesforce, Inc., any Salesforce software or platform rights, or any hardware, the Excluded Information identified in the APA, including Social Security and other government-issued identification numbers and credit card, debit card, financial account, and bank account numbers, or the Estate

Copy (as defined in Section 7(a)(iv) of the APA). The Customer Information Assets are the same assets defined as the "Assets" in the APA and are to be sold pursuant to an Asset Purchase Agreement ("APA") in substantially the same form attached as **Exhibit A.**[1]

### 3. Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose under these Bid Guidelines, a person or entity interested in consummating a Sale (a "Potential Bidder") must deliver or have previously delivered:

(i) an executed confidentiality agreement on terms acceptable to the Debtor (a "Confidentiality Agreement"), to the extent not already executed;

(ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "Financials") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtor in its discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Customer Information Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtor, in consultation with the advisors to the Committee, and/or (y) a written funding commitment acceptable to the Debtor and its advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale);

(iii) a letter of intent ("LOI") which includes a purchase price; and

(iv) a redline draft of the APA detailing required changes to the APA to be considered.

### 4. Qualified Bidders.

**(a)** A "Qualified Bidder" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale whose Bid is a Qualified Bid (as defined below), that will acquire the trade names, trademarks, service marks, logos, designs, goodwill, domain names, websites, and related digital properties included in the Customer Information Assets together with the Customer Information, so that it assumes control of the Debtor's business and not merely its records, whose stated intended use of the Customer Information is limited to the purposes disclosed in the Debtor's privacy policy in effect on the Petition Date (the "Privacy Policy") and is consistent with the promises made to customers when the information was collected, and that has agreed in writing to comply with the Privacy Policy and to accept such conditions as part of the order approving the

---

[1] Any discussion or description herein of the terms of the APA (including the identification of the Customer Information Assets subject to the APA) is qualified in its entirety by the terms of the APA itself, which should be reviewed in its entirety by any interested parties.

Sale (the "Approval Order"), with the Debtor, in consultation with the Committee, making the determination. On or before September 21, 2026, the Debtor's advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and (ii) provide to each Qualified Bidder copies of all Qualified Bids.

**(b)** The Debtor shall provide regular updates to the Committee on Potential Bidders and shall specifically identify any Potential Bidder who did not qualify to be a Qualified Bidder and the Debtor's basis for such determination. If any Potential Bidder is determined by the Debtor, in consultation with Committee, not to be a Qualified Bidder, the Debtor will refund such Potential Bidder's Deposit on or within five (5) business days after the Bid Deadline.

**(c)** After the Debtor notifies a Potential Bidder that it is a Qualified Bidder, the Debtor may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtor, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bid Guidelines; *provided that* any Qualified Bid may be improved at any auction conducted pursuant to Section 7. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bid Guidelines.

**5. Due Diligence.**

**(a) Due diligence Information.**

The Debtor will provide Potential Bidders with reasonable due diligence information, as requested by such Potential Bidders in writing, as soon as reasonably practicable after such request. For all Potential Bidders, the due diligence period will end on the Bid Deadline (as defined below), and subsequent to the expiration of the due diligence period, the Debtor will have no obligation to furnish any due diligence information.

The Debtor will not furnish any confidential information relating to the Customer Information Assets, to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement. The Debtor and its advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtor may decline to provide such information to Potential Bidders who, at such time and in the Debtor's reasonable business judgment after consultation with the Committee, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or in accordance with the terms of any applicable confidentiality agreement.

The Debtor also reserves the right, after consultation with the Committee, to withhold any diligence materials that the Debtor determines are sensitive after notifying the Potential Bidder requesting such materials of such determination. Neither the Debtor nor its representatives shall

be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder in accordance with these Bid Guidelines.

*All due diligence requests must be directed to Armanino Advisory LLC, 2700 Camino Ramon, Suite 350, San Ramon, CA 94583, Attn: Michael Hogan (michael.hogan@armanino.com) and Chris Lang (Chris.Lang@armanino.com).*

**(b) Communications with Potential Bidders.**

Notwithstanding anything contrary in these Bid Guidelines, all direct communication between and amongst Potential Bidders regarding the Debtor or its Customer Information Assets must involve the Debtor and the Debtor's advisors. No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtor.

**(c) Due Diligence from Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtor or its advisors regarding the ability of the Potential Bidder to consummate the applicable Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtor to determine, in consultation with the Committee, that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

**6. Bid Requirements.**

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "Bid Requirements") as determined by the Debtor, in consultation with the Committee, shall constitute a "Qualified Bid").

**(a) Identification of Bidder.** Each Bid must fully disclose the following: (i) the legal identity of each person or entity bidding for the Customer Information Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Customer Information Assets to be acquired in connection with such Bid) in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtor, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtor).

**(b) Purchase Price.** Each Bid must clearly set forth the cash consideration offered for the Customer Information Assets (the "Purchase Price") and components thereof.

**(c) Deposit.** Each Bid must be accompanied by a cash deposit in the amount of $125,000, to be held in a segregated, non-interest-bearing account, to be identified and established by the Debtor (the "Deposit"). The Debtor reserves the right to increase the Deposit requirement.

**(d) Required Bid Documents**. Each Bid must include a duly executed APA and any other transaction documents necessary to effectuate the transactions contemplated in the Bid. The APA shall be clearly marked to show all changes requested by the Qualified Bidder, as well as all

other material documents integral to such bid (collectively, the "Qualified Bid Documents"). The APA markup must specifically reflect any changes to APA. And if any bidder is interested in acquiring any of the Debtor's claims against customers including avoidance actions, the APA should be revised to reflect those terms and the Qualified Bid should contain information on the value being ascribed to such claims.

**(e) Committed Financing / Adequate Assurance Information.** To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtor (in consultation with the Committee) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtor, in consultation with the Committee.

**(f) Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

**(g) Time Frame for Closing.** Closing of the Sale (a "Closing") must be reasonably likely (based on availability of financing, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined below), on or before October 7, 2026.

**(h) Binding and Irrevocable.** Except as provided herein, a Qualified Bidder's Bid for the Customer Information Assets shall be irrevocable unless and until the Debtor (in consultation with the Committee) accepts a higher or otherwise better Bid for such Customer Information Assets. The Bid of the Successful Bidder shall remain irrevocable until the Closing.

**(i) Expenses; Disclaimer of Fees**. No Qualified Bidder will have any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid, such Qualified Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

**(j) Authorization.** Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(k) As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Customer Information Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the

Customer Information Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Customer Information Assets or the completeness of any information provided in connection therewith, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement.

**(l) Adherence to Bid Guidelines.** By submitting its Bid, each Qualified Bidder agrees to abide by and honor the terms of these Bid Guidelines and agrees not to submit a Bid after the Bid Deadline or seek to reopen the bidding after the Debtor has selected the Successful Bid.

**(m) Consent to Jurisdiction.** The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtor's qualification of bids, the construction and enforcement of these Bid Guidelines, the transaction documents related to the Sale, and the Closing, as applicable.

**(n) Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) so as to be actually received on or before 5:00 p.m. (prevailing Pacific Time) on September 14, 2026 (the "Bid Deadline") by the Notice Parties.

**(o) No Collusion; Good-Faith Bona Fide Offer**. Each Bid must include a written representation that (i) the Qualified Bidder has not engaged in any collusion with respect to the bidding, and (ii) its Bid is a good-faith bona fide offer and the Qualified Bidder intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder. If the Debtor elects to conduct an auction, each participating Qualified Bidder shall confirm the foregoing on the record at the auction.

**7. Auction; Selection of Successful Bid.**

The Debtor does not presently intend to conduct an auction for the Customer Information Assets. If the Debtor receives more than one Qualified Bid on or before the Bid Deadline, the Debtor reserves the right, but shall not be obligated, to conduct an auction among the Qualified Bidders. If the Debtor elects to conduct an auction, the Debtor shall provide written notice of such election to each Qualified Bidder and the Committee, which notice shall set forth the place (or remote means) of the auction and the terms and procedures that will govern the auction, including any minimum overbid increment. Any such auction shall be held on September 23, 2026, at 10:00 a.m. (prevailing Pacific Time). Whether or not an auction is conducted, the Debtor shall determine the highest or otherwise best Qualified Bid, in its reasonable business judgment and in consultation with the Committee, which Bid shall be the "Successful Bid" and such Qualified Bidder the "Successful Bidder." The Debtor's acceptance of any Successful Bid is conditioned upon approval of the Court at the Sale Hearing. As soon as reasonably practicable after the Debtor selects the Successful Bid, the Debtor shall cause the Qualified Bid Documents for the Successful Bid to be filed with the Court.

**8. Reservation of Rights.**

The Debtor reserves its rights to modify these Bid Guidelines in its reasonable business judgment, and in consultation with the Committee and in any manner that will best promote the goals of the bidding process, or impose additional customary terms and conditions on the sale of

the Customer Information Assets, including, without limitation: (a) extending the deadlines set forth in these Bid Guidelines; (b) adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances; (d) electing to conduct, or declining or cancelling, an auction; and (e) rejecting any or all Bids;

**9. Sale Hearing.**

A hearing to consider approval of the Sale of the Assets to the Successful Bidder (the "Sale Hearing") is currently scheduled to take place at **1:00 p.m. (prevailing Pacific Time) on September 30, 2026** before the Honorable Sheri Bluebond, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Central District of California, Courtroom 1539.

At the Sale Hearing, the Debtor shall present the Successful Bid to the Court for approval.

**10. Return of Deposit; Remedies.**

The Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at the Closing. The Deposits for each Qualified Bidder shall be held in one or more non- interest-bearing escrow accounts on terms acceptable to the Debtor (in consultation with the Committee) and shall be returned (other than with respect to the Successful Bidder) on or within five (5) business days after the Sale Hearing.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtor will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtor as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

**11. Fiduciary Out.**

Nothing in these Bid Guidelines shall require the Debtor to take any action, or to refrain from taking any action, with respect to these Bid Guidelines, to the Debtor in consultation with the Committee determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Greenberg Glusker Fields Claman & Machtinger LLP, 2049 Century Park East, Suite 2600, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (specify): **Debtor's Notice of Motion and Motion for an Order Approving (I) Appointment of a Consumer Privacy Ombudsman and (II) Sale of Customer Information Assets Free and Clear of Liens, Claims, and Interests Memorandum of Points and Authorities; and Declaration of Michael Hogan** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 19, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Baruch C Cohen bcc@BaruchCohenEsq.com, paralegal@baruchcohenesq.com**
- **Brian L. Davidoff bdavidoff@greenbergglusker.com, calendar@greenbergglusker.com;jking@greenbergglusker.com;cmillerwatkins@greenbergglusker.com;MilanaECF@ggfirm.com**
- **M Douglas Flahaut df@echoparklegal.com**
- **Alan J Friedman afriedman@shulmanbastian.com, lgauthier@shulmanbastian.com**
- **David M Goodrich dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com**
- **Kenneth C Greene kenlaw100@gmail.com**
- **Jennifer L Nassiri JNassiri@sheppardmullin.com, xmaurice@sheppardmullin.com**
- **Steven Phillip Ordaz sordaz@bmcgroup.com, info@ecfalerts.com**
- **Jonathan Seligmann Shenson jshenson@greenbergglusker.com, calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com;MilanaECF@ggfirm.com**
- **David Samuel Shevitz David.S.Shevitz@usdoj.gov**
- **United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov**

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) August 19, 2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 19, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Proposed Counsel to Official Committee of Unsecured Creditors, Ice Miller LLP***
Christopher Samis - Christopher.Samis@icemiller.com
Aaron Stulman - Aaron.Stulman@icemiller.com
Sarah Gladieux - Sarah.Gladieux@icemiller.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 08/19/2026 | Cynthia Miller Watkins | ***/s/ Cynthia Miller Watkins*** |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |